Louis TERRAZAS, et al., Relators,

v.

Hon. Mario E. RAMIREZ, Judge of the 332nd District Court in Hidalgo County, Texas, et al., Respondents.

No. D–1817.

Supreme Court of Texas.

Dec. 17, 1991.

Motion for Leave to File
Motion for Rehearing
Denied Jan. 15, 1992.

John N. McCamish, Jonathan David Pauerstein, Kevin M. Warburton, San Antonio, for relators.

Dan Morales, Atty. Gen., Renea Hicks, Javier P. Guajardo, Asst. Attys. Gen., Austin, for respondents.

James C. Harrington, Austin, Travis Hiester, McAllen, Judith Sanders–Castro, Jose Garza, San Antonio, for respondents-intervenors.

## OPINION

HECHT, Justice.

Following publication of the 1990 United States decennial census, the Seventy–Second Legislature enacted Senate Bill 31[1] and House Bill 150,[2] reapportioning state senatorial and representative districts, respectively, as required by article III, section 28 of the Texas Constitution.[3] In litigation challenging the accuracy of the 1990 census and the validity of any redistricting based upon it, Hon. Mario E. Ramirez, Judge of the 332nd District Court in Hidalgo County, Texas, has ordered that all elections for the Texas Senate and House of Representatives be based, not upon the reapportionment statutes enacted by the Legislature, but upon districts reconfigured by the court.

Two judgments rendered by the district court affect state senatorial districts, one dated October 11, 1991, in Cause No. C–454–91–F, styled *Mena v. Richards*, and the other dated October 7, 1991, in Cause No. C–4395–91–F, styled *Quiroz v. Richards*. Both judgments were based upon a settlement agreement between the plaintiffs in the two cases and three of the defendants, the Governor and the director and executive director of the Texas Legislative Council. These defendants are represented by the Texas Attorney General, who executed the settlement agreement on their behalf.

In the original mandamus proceeding now before this Court, five individuals who were not parties in either suit[4] request us to direct the district court to vacate these two judgments. They argue, in essence, that the district court, in redistricting the State by merely approving an agreement of the Governor, the Attorney General, and a few other individuals, encroaches upon a power which the Constitution commits to the Legislature. They also ask that the Attorney General be directed to rescind his agreement to the judgments, and that the Secretary of State be directed to withdraw the districting plan created by the judgments from preclearance consideration by the United States Department of Justice

1. Act of May 24, 1991, 72nd Leg., R.S., ch. 892, 1991 Tex.Sess.Law Serv. 3016 (Vernon).

2. Act of May 24, 1991, 72nd Leg., R.S. ch. 899, 1991 Tex.Sess.Law Serv. 3073 (Vernon).

3. "The Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts, agreeable to the provisions of Sections 25, 26, and 26–a of this Article...."

4. Relators are Louis Terrazas, Ernest Angelo, Jr., Tom Craddick, Robert A. Estrada, and Sim D. Stokes III.

under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

We hold that a district court cannot order a reapportionment plan for the State based upon nothing more than the agreement of the Governor, the Attorney General, and a few citizens. Accordingly, we conditionally grant the requested relief directed to Judge Ramirez. We deny relief against the Attorney General and Secretary of State.

## I

A somewhat detailed history of the *Mena* and *Quiroz* litigation out of which the present proceeding arises is important to place in context the legal issues raised.

The *Mena* lawsuit, filed February 7, 1991, originally sought to prohibit use of the 1990 census to reapportion the State's legislative, congressional, and state board of education districts. The suit was filed against two groups of defendants: the Governor, the director and executive director of the Texas Legislative Council, whom we refer to as "the state defendants", all of whom are represented by the Attorney General; and the county judge and commissioners of Hidalgo County, whom we refer to as "the county defendants", and who are not represented by the Attorney General. Plaintiffs alleged that the 1990 census disproportionately undercounted racial and ethnic minority populations in Texas, and that any reapportionment based upon it, without adjusting for such undercount, would violate article I, sections 3, 3a, 19 and 29 of the Texas Constitution.[5]

Notwithstanding this lawsuit, the Legislature during its regular session enacted Senate Bill 31 and House Bill 150, reapportioning state senatorial and representative districts, respectively, using the 1990 census. The Legislature did not reapportion congressional or board of education districts during the regular session. Plaintiffs in the *Mena* suit then amended their petition to request a declaration that Senate Bill 31 and House Bill 150 are unconstitutional, to enjoin elections based upon those statutes, and to require that legislative districts be redrawn. Plaintiffs also challenged the constitutionality of pre–1991 congressional districts, TEX.REV.CIV.STAT. ANN. art. 197g (Vernon Supp.1991), and board of education districts, TEX.EDUC.CODE § 11.21. Plaintiffs moved for summary judgment and for a temporary injunction.

Beginning August 5, 1991, the district court heard evidence and argument for approximately three days on plaintiffs' application for temporary injunction. The court also heard argument on plaintiffs' motion for summary judgment. The state defendants, represented by the Attorney General, defended the validity of the Legislature's apportionment statutes. The county defendants aligned themselves with plaintiffs. Following this hearing, on August 22, the district court granted partial summary judgment for plaintiffs, declaring that the 1990 census disproportionately undercounted Mexican–American and African–American populations in Texas, that use of unadjusted 1990 census data as a basis for any reapportionment violates article I, sections 3, 3a, 19 and 29 of the Texas Constitution, and that Senate Bill 31 and House Bill 150, which are based upon unadjusted 1990 census data, violate the same sections of the Texas Constitution as well as article III, sections 25, 26 and 28.

While this ruling as requested by plaintiffs is very broad, the district court went

---

5. "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." TEX. CONST. art. I, § 3.

"Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative." *Id.* § 3a.

"No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." *Id.* § 19.

"To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void." *Id.* § 29.

much further. It held that further use of all legislative, congressional and board of education districts apportioned on the basis of *1980*, not *1990*, census data, would also be unconstitutional. The district court issued a temporary injunction mandating the state defendants to submit, by September 30, 1991, new reapportionment plans using adjusted census figures to compensate for the undercounting found by the court. The court also enjoined any further reapportionment based upon 1990 census data and any legislative elections based upon Senate Bill 31 and House Bill 150. The court set trial on the merits for October 1.

Three days later, the Legislature in its second called session enacted congressional and board of education reapportionment statutes based upon 1990 census data. Act of Aug. 25, 1991, 72nd Leg., 2d C.S., ch. 2, 1991 Tex.Sess.Law Serv. 2 (Vernon) (board of education districts); Act of Aug. 25, 1991, 72nd Leg., 2d C.S., ch. 7, 1991 Tex. Sess.Law Serv. 41 (Vernon) (congressional districts). Despite the district court's sweeping temporary injunction, the Governor signed these statutes. Plaintiffs have not directly challenged them.

On August 23, the day after the district court issued its order, the state defendants filed their notice of direct appeal to this Court. They filed their statement of jurisdiction in this Court on September 23, and moved to stay proceedings in the district court so that the parties could focus their efforts on the appeal. We granted the motion on September 24. Despite this stay, on September 27 the district court signed extensive findings of fact and con-clusions of law in support of its August 22 order.

On October 4, nineteen of the thirty-one state senators requested the Attorney General to propose an alternate senate redistricting plan to plaintiffs to settle that portion of the litigation. The Lieutenant Governor did not endorse the plan but indicated that he would abide by the will of the Senate and encouraged the Attorney General to settle the case if possible. On October 7, plaintiffs and the state defendants entered into an agreement to settle their dispute regarding state senatorial districts based upon the proposed alternate plan. In accordance with the agreement, the parties took the following actions, all on October 7, to avoid the effect of our stay of proceedings in *Mena*. Plaintiffs filed a new lawsuit against the state defendants in the 332nd District Court, styled *Quiroz v. Richards*. Plaintiffs alleged essentially the same claims against Senate Bill 31 as in *Mena*, but against the state defendants only. The state defendants answered. All parties filed a joint motion for entry of an agreed final judgment prohibiting any elections based upon Senate Bill 31 and ordering that elections for the State Senate be based instead on the alternate redistricting plan attached to the judgment until enactment of another under Texas law and preclearance under federal law. The state defendants expressly did not concede the invalidity of Senate Bill 31 and the agreed judgment did not hold the statute invalid. The district court signed the agreed judgment "[b]ased upon the Joint Motion for Entry of Agreed Final Judgment, and arguments and stipulations of counsel".[6]

---

6. The judgment in its entirety is as follows:
 "Based upon the Joint Motion for Entry of Agreed Final Judgment, and arguments and stipulations of counsel in support thereof, the Court grants the motion and enters final judgment as follows in the above-referenced action.
 "It is hereby ORDERED, ADJUDGED, and DECREED that:
 "1. The state defendants, their attorneys, and all those in active concert or participation with them are permanently enjoined from implementing in any fashion the election plan for Senate of Texas districts enacted as S.B. 31 and from using it hereafter as the basis for the conduct of any elections, primary and general, for the Senate in Texas.

"2. The state defendants, their attorneys, and all those in active concert or participation with them are permanently enjoined to conduct henceforth all elections, primary and general, for the Senate in Texas under the districting plan detailed in Exhibit A, attached hereto and incorporated herein for all purposes.
 "3. The injunction set forth in paragraph 2, above, is dissolved effective immediately upon enactment under Texas law of a districting plan for Texas Senate elections and its preclearance pursuant to the provisions of Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, to the extent that provision remains otherwise applicable. In the event this

The Secretary of State notified the United States Department of Justice that he was substituting the agreed plan for the Senate Bill 31 plan for preclearance consideration.[7] And the state defendants moved this Court to lift its stay of proceedings in *Mena* to allow the trial court to consider the same proposed settlement in that case.

On October 9, we noted probable jurisdiction over the direct appeal in *Mena. Richards v. Mena*, 820 S.W.2d 371 (1991); *see* TEX. CONST. art. V, § 3–b; TEX.GOV'T CODE § 22.001(c); TEX.R.APP.P. 140. We also granted the parties' requests to expedite consideration, established a briefing schedule, and set the case for oral submission on October 29. *Richards*, 820 S.W.2d at 371. On October 10, we granted the state defendants' motion to lift our stay of proceedings in the district court. *Id.* at 371. On

October 11, the district court rendered in *Mena* a "partial final" judgment, presumably interlocutory, essentially the same as the judgment it had rendered four days before in *Quiroz*.[8] As in *Quiroz*, the *Mena* judgment was based upon the parties' agreement and joint motion and did not adjudicate Senate Bill 31 to be invalid. The county defendants did not join in the settlement agreement but did approve the judgment.

On October 30, the day after the direct appeal was argued before this Court, we lifted our stay of proceedings in the district court altogether to allow the parties to proceed to trial and the district court to render a final judgment as expeditiously as possible. We retained jurisdiction of the appeal, suspending enforcement of the district court's August 22 order, but expressed no opinion on the issues raised.

---

occurs, the plaintiffs retain their full rights to initiate litigation again.

"4. All other provisions of Texas law which are otherwise applicable remain effective with respect to Texas Senate elections.

"5. Costs herein are assessed against the State Defendants.

"6. All other relief relating to the claims in this case, *Quiroz v. Richards*, not expressly granted herein is denied.

"SIGNED this 7th day of October, 1991."

7. On November 18, the United States Department of Justice granted preclearance approval of the agreed senate reapportionment plan ordered by the district court. However, the Assistant Attorney General noted:

While we are preclearing this plan under Section 5, the extraordinarily convoluted nature of some districts compels me to disclaim any implication that our preclearance establishes that the proposed plan is otherwise lawful or constitutional. I understand that litigation challenging the legal and constitutional propriety of various districts is pending. *Terrazas v. Slagle*, No. 91–CA–428 (W.D.Tex.). Our preclearance of the submitted redistricting plan in no way addresses the state's approach to its redistricting obligations other than with regard to Section 5 [of the Voting Rights Act of 1965, 42 U.S.C. § 1973c]. Indeed, Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change.

8. The judgment in its entirety is as follows:

"Based upon the Joint Motion for Entry of Agreed Partial Final Judgment, and arguments

and stipulations of counsel in support of a virtually identical joint motion in the related case of *Quiroz v. Richards*, No. C–4395–91–F, over which this Court presided and of which this Court takes judicial notice, the Court grants the motion and enters partial final judgment as follows in the above-referenced action.

"It is hereby ORDERED, ADJUDGED, and DECREED that:

"1. The state defendants, their attorneys, and all those in active concert or participation with them are permanently enjoined from implementing in any fashion the election plan for Senate of Texas districts enacted as S.B. 31 and from using it hereafter as the basis for the conduct of any elections, primary and general, for the Senate in Texas.

"2. The state defendants, their attorneys, and all those in active concert or participation with them are permanently enjoined to conduct henceforth all elections, primary and general, for the Senate in Texas under the districting plan detailed in Exhibit A, attached hereto and incorporated herein for all purposes.

"3. The injunction set forth in paragraph 2, above, is dissolved effective immediately upon enactment under Texas law of a districting plan for Texas Senate elections and its preclearance pursuant to the provisions of Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, to the extent that provision remains otherwise applicable. In the event this occurs, the plaintiffs retain their full rights to initiate litigation again.

"4. All other provisions of Texas law which are otherwise applicable remain effective with respect to Texas Senate elections.

"SIGNED this 11th day of October, 1991."

*Richards v. Mena,* 820 S.W.2d 371 (1991).[9]

On November 5, State Senators Bill Sims and Eddie Lucio, Jr. attempted to intervene in *Mena* and *Quiroz,* and filed a motion for new trial in each case asking the district court to vacate the agreed judgments and proceed to trial on the merits. Plaintiffs moved to strike the intervention in both cases. The district court heard evidence and argument on these motions on November 25 and 26. On November 27, the court signed an order in *Mena* striking Sims and Lucio's intervention for lack of standing and denying their motion for new trial. That same day the court signed what purports to be a final judgment in *Mena,* adopting a state representative redistricting plan proposed by plaintiffs without agreement, or counteroffer, from the state defendants, and prohibiting further use of House Bill 150. On December 3, 1991, the court struck Sims and Lucio's intervention in *Quiroz* and denied their motion for new trial in that case.

On November 25, five individuals not parties to the *Mena* or *Quiroz* cases moved for leave to file their petition for writ of mandamus in this Court. Relators ask that the district court be directed to vacate its October 7 and October 11 judgments ordering reconfigured senatorial districts. Relators also ask that the Attorney General be directed to rescind the settlement agreement, and that the Secretary of State withdraw the plan ordered by the district court from preclearance consideration by the Department of Justice. Relators do not challenge in this proceeding the court's judgment reconfiguring representative districts. We granted relators' motion on December

3, and set the case for oral argument the following week. 35 Tex.Sup.Ct.J. 168, 170.

## II

### A

■ The responsibility for apportioning the State into legislative districts belongs primarily to the Legislature. Tex. Const. art. III, § 28. The judiciary, however, is both empowered and, when properly called upon, obliged to declare whether an apportionment statute enacted by the Legislature is valid. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Clements v. Valles,* 620 S.W.2d 112 (Tex.1981); *Smith v. Craddick,* 471 S.W.2d 375 (Tex.1971); *Smith v. Patterson,* 111 Tex. 535, 242 S.W. 749 (1922). A judicial determination that an apportionment statute violates a constitutional provision is no more an encroachment on the prerogative of the Legislature than the same determination with respect to some other statute. The Legislature, as well as the judiciary, must comply with the United States Constitution and the Texas Constitution. Yet a court's duty to consider a party's constitutional challenge to a statute, never to be taken lightly, and the deference owed a coordinate branch of government, are rarely more sensitive or serious matters than when the statute attacked involves the highly politically charged subject of apportionment.[10]

■ Although state courts in Texas have invalidated apportionment statutes, none has ever imposed a substitute plan upon the State. Nevertheless, we do not doubt

9. On December 11, the Court dismissed the direct appeal from the temporary injunction as moot. *Richards,* 820 S.W.2d at 372.

10. Justice Mauzy's dissent improperly attempts to import the politically charged atmosphere of this litigation into our own deliberations and opinions, for example, by emphasizing that relators are Republicans, *post,* at 739, and by suggesting that relators' claims are contrary to an increase in Mexican–American representation in the Legislature, *post,* at 748, when the dissenters well know that relators are complaining of minority underrepresentation in their federal litigation. "Politics," the dissent says, "not precedent or the rule of law, has determined the outcome of this action." This accusation directed against the Court is disproved by the fact that the result in this case is not the result of a division on party lines. Every opinion but Justice Mauzy's refuses to discuss the partisan political interests involved. As strongly as those interests have influenced the underlying litigation from its inception, their only role in this Court is in Justice Mauzy's opinion. We stress that the rules we announce, most of which the dissents agree with, govern irrespective of the political forces at play in redistricting litigation.

the power of our courts to do so. United States District Courts have this power, *Reynolds*, 377 U.S. at 586–87, 84 S.Ct. at 1394–95, and have exercised it in Texas. *E.g.*, *Terrazas v. Clements*, 537 F.Supp. 514 (N.D.Tex.1982) (holding pre–1981 apportionment plans for state legislature unconstitutional, and adopting temporary plans), *stay denied*, 456 U.S. 902, 102 S.Ct. 1745, 72 L.Ed.2d 158, *further proceedings*, 581 F.Supp. 1319 (N.D.Tex.1983) (state senate), *and* 581 F.Supp. 1329 (N.D.Tex.1984) (state house of representatives); *Seamon v. Upham*, 536 F.Supp. 931 (E.D.Tex.), *vacated and remanded*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725, *on remand*, 536 F.Supp. 1030 (E.D.Tex.1982), *further proceedings sub nom. Strake v. Seamon*, 469 U.S. 801, 105 S.Ct. 63, 83 L.Ed.2d 14 (1984) (mem.); *Graves v. Barnes*, 343 F.Supp. 704 (W.D.Tex.), *aff'd in part and reversed in part sub nom. Archer v. Smith*, 409 U.S. 808, 93 S.Ct. 62, 34 L.Ed.2d 68 (1972) (mem.), *and aff'd in part and reversed in part sub nom. White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), *on remand*, 378 F.Supp. 640 (W.D.Tex. 1974), *vacated and remanded sub nom. White v. Regester*, 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975), *on remand*, 408 F.Supp. 1050 (W.D.Tex.1976), *further proceedings*, 446 F.Supp. 560 (W.D.Tex. 1977), *aff'd sub nom. Briscoe v. Escalante*, 435 U.S. 901, 98 S.Ct. 1444, 55 L.Ed.2d 492 (1978) (mem.); *Kilgarlin v. Martin*, 252 F.Supp. 404 (S.D.Tex.1966), *aff'd in part and rev'd and remanded in part sub nom. Kilgarlin v. Hill*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967) (per curiam); *Bush v. Martin*, 224 F.Supp. 499 (S.D.Tex.1963), *aff'd*, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964) (per curiam), *further proceedings*, 251 F.Supp. 484 (S.D.Tex.1966). *See also White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), *dismissed on appeal after remand*, 505 F.2d 912 (5th Cir.), *cert. denied*, 421 U.S. 993, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975). State courts in other jurisdictions have also ordered apportionment plans after invalidating legislative plans. *E.g.*, *Legislature of California v. Reinecke*, 9 Cal.3d 166, 107 Cal.Rptr. 18, 507 P.2d 626 (1973), *pursuant to jurisdiction retained in* 7 Cal.3d 92, 101 Cal.Rptr. 552, 496 P.2d 464, *modifying* 6 Cal.3d 595, 99 Cal.Rptr. 481, 492 P.2d 385 (1972); *Hellar v. Cenarrusa*, 106 Idaho 586, 682 P.2d 539, *and* 106 Idaho 617, 682 P.2d 570 (order), *pursuant to jurisdiction retained in* 106 Idaho 571, 682 P.2d 524, *and* 106 Idaho 585, 682 P.2d 538 (1984) (order), *after remand in* 104 Idaho 858, 664 P.2d 765 (1983); *People ex rel. Engle v. Kerner*, 33 Ill.2d 11, 210 N.E.2d 165 (1965), *appeal dismissed*, 384 U.S. 30, 86 S.Ct. 1284, 16 L.Ed.2d 332 (1966), *pursuant to jurisdiction retained in* 32 Ill.2d 212, 205 N.E.2d 33 (1965); *Kruidenier v. McCulloch*, 261 Iowa 1309, 158 N.W.2d 170 (1968), *pursuant to jurisdiction retained in* 258 Iowa 1121, 142 N.W.2d 355, *cert. denied*, 385 U.S. 851, 87 S.Ct. 79, 17 L.Ed.2d 80 (1966); *Monier v. Gallen*, 122 N.H. 474, 446 A.2d 454 (1982); *Butcher v. Bloom*, 420 Pa. 305, 216 A.2d 457 (1966), *pursuant to jurisdiction retained in* 415 Pa. 438, 203 A.2d 556 (1964); *State ex rel. Reynolds v. Zimmerman*, 23 Wis.2d 606, 128 N.W.2d 16, *pursuant to jurisdiction retained in* 22 Wis.2d 544, 126 N.W.2d 551 (1964); *but see Sweeney v. Notte*, 95 R.I. 68, 183 A.2d 296, 303 (1962). Reason and experience argue that courts empowered to invalidate an apportionment statute which transgresses constitutional mandates cannot be left without the means to order appropriate relief. While this power has generally been exercised by a state's highest court, we see no constitutional reason why it does not also reside in a trial court of general jurisdiction.

■ Although Texas courts may order apportionment, that power ought to be used only after investigation and careful consideration of the many, diverse interests affected, after due deference to the Legislature to rectify its own statutes, and after due regard for the effect of the court's order on the election process. We comment on each of these considerations in turn.

### 1

Apportionment affects every person in the State, yet only a very few parties can

be involved in any lawsuit challenging redistricting. The trial court must attempt to consider the interests, not only of the parties in the case, but of others who are not present. For this reason, the agreement of the parties in a reapportionment lawsuit cannot alone be conclusive of either the validity of the statute or, if it is found to be invalid, the relief to be granted.

In most cases, the agreement of the parties to a suit is sufficient basis for rendition of judgment. *See Pope v. Powers,* 132 Tex. 80, 120 S.W.2d 432, 436 (1938). In some cases, however, even if the parties present agree, judgment cannot be rendered without evidence and a hearing. Invariably, these rules are erected to protect the interest of some person or group which has not been adequately represented in the settlement. In some instances, this interest may belong to a party to a lawsuit, such as a minor or an incompetent, TEX.R.CIV.P. 44, *Reagan v. Vaughn,* 804 S.W.2d 463, 487 (Tex.1990) (Hecht, J., dissenting) ("[a]ny settlement with minor children must be judicially approved, necessitating the filing of a lawsuit and appointment of a guardian ad litem"); a member of a class, TEX.R.CIV.P. 42(e); or a defendant served by publication, TEX.R.CIV.P. 244. In others, however, the individuals or groups to be protected are those who are not participants in the litigation, but whose rights and interests are affected thereby.

This principle has been recognized in a broad array of cases. *Janus Films, Inc. v. Miller,* 801 F.2d 578, 582 (2nd Cir.1986) (copyright case consent decree); *Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983) (shareholder derivative actions); *Adams v. Bell,* 711 F.2d 161, 170 n. 40 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984) (school desegregation: "a court should enter a consent decree affecting the public interest only after considering the substantive validity of the decree"); *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 225 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982) (antitrust: "[t]he reason the court is called on to review a settlement is to protect the rights of the many absent class members who were not involved in the negotiations leading to settlement"); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977) (Title VII cases); *Neel v. Fuller,* 557 S.W.2d 73, 76 (Tex.1977) (receiverships). In multiparty litigation, when a settlement between some but not all of the parties affects others, the court's duty is summarized in *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981) (en banc):

When presented with a proposed consent decree, the court's duty is akin, but not identical to its responsibility in approving settlements of class actions, stockholders' derivative suits, and proposed compromises of claims in bankruptcy. In these situations, the requisite court approval is merely the ratification of a compromise. The court must ascertain only that the settlement is "fair, adequate and reasonable."

Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit, or stipulation. If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed.

This same principle applies in redistricting suits, in which the public as a whole is peculiarly affected. Thus, courts in such cases have implemented procedures to elicit broad input before making their determinations. For example, the California Supreme Court has stated:

Before this court, in the discharge of its duty to insure the electorate equal protection of the laws, undertakes to draft

reapportionment plans of its own, it should afford all interested parties an opportunity to be heard.

*Reinecke*, 107 Cal.Rptr. at 19, 507 P.2d at 627. The need for an open process and for active judicial scrutiny is particularly acute in those situations in which the principal parties have, in whole or in part, resolved their differences, and there remains no party to actively represent conflicting public interests. An apportionment statute cannot be invalidated and an alternate plan ordered without hearing and careful deliberation. As the court stated in *Terrazas v. Clements*, 581 F.Supp. at 1322–23:

> [T]he consent decree proposed by the State's Motion clearly affects the rights of third parties since it involves the adoption of a reapportionment plan for all the Senate districts in the State. Further, the proposed decree contemplates that it will remain in effect for all state senatorial elections until following publication of the federal decennial census of 1990 or until such earlier date as a valid plan is enacted by the State of Texas and becomes effective. Under these circumstances, this Court is obligated to examine the proposed consent decree carefully to ascertain not only that it is fair, adequate and reasonable as to the parties and affected third parties but also that it does not violate the United States Constitution or any other applicable federal or state law.

*See Overton v. City of Austin*, 748 F.2d 941, 953 (5th Cir.1984). The hearing should provide sufficient evidence, adduced by testimony, documents, stipulations or some other manner, to permit the district court to make an informed ruling that can be reviewed on appeal.

### 2

Furthermore, the court must give due deference to the Legislature before ordering a substitute apportionment plan. Apportionment involves uniquely political judgments, and for sound practical as well as theoretical reasons is constitutionally committed to the legislative branch. As the United States Supreme Court stated in *Connor v. Fitch*, 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977): "a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality." Thus, "judicial relief becomes appropriate only when a legislature fails to reapportion according to ... constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds*, 377 U.S. at 586, 84 S.Ct. at 1394. After a legislative plan has been invalidated, respect for the separation of powers explicitly recognized in article II, section 1 of our Constitution requires that the Legislature be given a reasonable opportunity to enact a substitute statute. Only in the most exigent circumstances should a court intrude into this arena without affording the Legislature a full opportunity to remedy any defects.

Moreover, the court must attempt to give effect to as many of the Legislature's redistricting decisions as are not invalid. There are a vast number of possible plans for apportioning state legislative districts that fully comply with all applicable laws. When a court sets aside the plan chosen by the Legislature, the beginning point for fashioning a substitute plan must be those aspects of the legislated scheme which are valid. *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).

### 3

Finally, the court must consider the impact of its decision upon the electoral process. In lieu of postponing the elections, the court may determine that it is more advisable to allow elections to proceed under the lines drawn by the Legislature. Many courts have permitted impending elections to proceed under lines already declared unconstitutional in order to permit the legislative process to perform in an orderly fashion. *See, e.g., Upham*, 456 U.S. at 44, 102 S.Ct. at 1522–23; *Bullock v. Weiser*, 404 U.S. 1065, 92 S.Ct. 750, 30 L.Ed.2d 752 (1972) (stayed district court order imposing new congressional district boundaries and retained jurisdiction to ex-

tend filing deadline in the event the Governor called a special legislative session), *on subsequent appeal, White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Ely v. Klahr,* 403 U.S. 108, 113–14, 91 S.Ct. 1803, 1806–07, 29 L.Ed.2d 352 (1971); *Kilgarlin v. Hill,* 386 U.S. at 121, 87 S.Ct. at 821, *aff'g in this respect and rev'g and remanding in part on other grounds Kilgarlin v. Martin,* 252 F.Supp. 404 (permitting 1966 election for Texas House of Representatives to proceed despite a determination of unconstitutionality); *Watkins v. Mabus,* 771 F.Supp. 789, 803–05 (S.D.Miss.), *aff'd as modified,* —— U.S. ——, 112 S.Ct. 412, 116 L.Ed.2d 433 (1991); *Burton v. Hobbie,* 543 F.Supp. 235, 239 (M.D.Ala.), *aff'd* 459 U.S. 961, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982) (mem.); *Cosner v. Dalton,* 522 F.Supp. 350, 364 (E.D.Va. 1981); *WMCA, Inc. v. Lomenzo,* 246 F.Supp. 953, 955 (S.D.N.Y.1965), *aff'd sub nom. Travia v. Lomenzo,* 382 U.S. 287, 86 S.Ct. 436, 15 L.Ed.2d 336 (1965); *Petuskey v. Clyde,* 234 F.Supp. 960, 964 (D.Utah 1964); *Buckley v. Hoff,* 234 F.Supp. 191, 200 (D.Vt.1964), *modified,* 379 U.S. 359, 85 S.Ct. 503, 13 L.Ed.2d 352 (1965); *Lisco v. McNichols,* 208 F.Supp. 471 (D.Colo.1962); *Toombs v. Fortson,* 205 F.Supp. 248, 259 (N.D.Ga.1962), *vacated in part on other grounds and remanded,* 379 U.S. 621, 85 S.Ct. 598, 13 L.Ed.2d 527 (1965) (mem.); *Reinecke,* 99 Cal.Rptr. at 486, 492 P.2d at 390; *White v. Anderson,* 155 Colo. 291, 394 P.2d 333, 338 (1964); *Hellar,* 664 P.2d at 766; *Kruidenier,* 142 N.W.2d at 376, *and* 158 N.W.2d at 173. Such deference, in the absence of unconscionable delay, is entirely appropriate. *See Swann v. Adams,* 383 U.S. 210, 211, 86 S.Ct. 767, 767–68, 15 L.Ed.2d 707 (1966) (court could not delay effectuation of remedy until 1969 legislative session in case filed in 1962).

In some circumstances, however, a court possesses the equitable power to postpone or even cancel elections. *See, e.g., Butter-*

*worth v. Dempsey,* 229 F.Supp. 754 (D.Conn.), *aff'd sub nom. Pinney v. Butterworth,* 378 U.S. 564, 84 S.Ct. 1918, 12 L.Ed.2d 1037 (1964), *on remand or subsequent appeal, Butterworth v. Dempsey,* 237 F.Supp. 302 (D.Conn.1965). But there is far more authority for allowing elections to go forward, even on unconstitutional plans, than there is for postponing or canceling them.

## B

To reiterate, only after giving full and careful consideration to the interests affected by its ruling and the effect upon the election process, and after affording the Legislature sufficient opportunity to correct the constitutional infirmities in apportionment legislation, may the district court order its own apportionment plan.[11] The judgments challenged in this proceeding do not meet these standards.

In *Mena,* the only parties were a few citizens as plaintiffs, the Governor and two other state defendants represented by the Attorney General, and the county defendants. Only the plaintiffs and the state defendants joined in the settlement agreement upon which agreed judgments were rendered in both *Mena* and *Quiroz.*

■■■■ The parties in this proceeding have focused much of their argument on the power of the Attorney General to execute the settlement agreement. The concurring opinions of Justice Gonzalez and Justice Cornyn would hold that the Attorney General exceeded his authority. We do not agree with their views. The Attorney General, as the chief legal officer of the State, has broad discretionary power in conducting his legal duty and responsibility to represent the State. *See* Tex. Const. art. IV, § 22; Tex.Gov't Code § 402.021; *see also Maud v. Terrell,* 109 Tex. 97, 200 S.W. 375 (1918); *Lewright v. Bell,* 94 Tex. 556,

---

11. Justice Mauzy's dissent alleges that we have invented these principles as a basis for relief. *Post,* at 739. To the contrary, as we have shown, they are derived from a rather substantial body of redistricting litigation throughout the country. The dissent also alleges that we do not deny that relators have not urged the grounds upon which our opinion relies. *Post,* at 739. In fact, we do. Relators have sought mandamus against the district court specifically on the grounds that it did not have the power to render the agreed judgments supplanting Senate Bill 31. This request for relief encompasses the grounds upon which our opinion rests.

63 S.W. 623 (1901); *Bullock v. Texas Skating Ass'n*, 583 S.W.2d 888, 894 (Tex.Civ. App.—Austin 1979, writ ref'd n.r.e.). This discretion includes the authority to propose a settlement agreement in an action attacking the constitutionality of a reapportionment statute. The Attorney General has participated in such settlements on previous occasions. *Terrazas*, 581 F.Supp. at 1321; *Graves*, 408 F.Supp. at 1052. Although the Attorney General appears to have acted throughout this litigation only on behalf of the state defendants and not for himself, he had the authority, certainly for his clients and even on his own, to suggest possible remedies after the district court rendered an interlocutory summary judgment holding Senate Bill 31 unconstitutional. He also had the power to negotiate a settlement with the plaintiffs and to execute an agreement with them. To hold that he did not would be to give him less authority than any party or any other attorney participating in the case.

 The real issue, however, is not whether the Attorney General had the power to do what he did in this case, but what the effect of his action was. As he conceded at oral argument, he certainly had no power to effectuate a valid reapportionment of senatorial districts himself; that could be done only by judgment of the district court. The settlement agreement may have been a valid agreement between plaintiffs and the state defendants. It alone could not, however, support rendition of a judgment without evidence and without other interested parties being encouraged to intervene in the litigation.

In *Quiroz*, where the agreed judgment regarding senatorial districts was first rendered, the court heard no evidence concerning the settlement agreement. The suit and answer were filed, and judgment was rendered, all in one day, in the span of a few minutes. There was literally no opportunity at all for comment. This irregular procedure was designed to avoid our stay of proceedings in *Mena*, and we do not approve it. A few days later, the same judgment was rendered in *Mena* on the same basis, again with no opportunity to be heard. Two State Senators directly affected by the judgment attempted to intervene in both cases and set aside the judgments, but their interventions were struck by the district court. The manner in which the judgments were rendered in these cases excluded any comment by anyone not a party to the settlement agreement.

JUSTICE MAUZY's dissent argues that the Court approved this procedure by its October 10 order lifting the stay of proceedings in *Mena* to allow rendition of the same judgment in that case that the district court had already rendered in *Quiroz*. *Post*, at 743. The dissent states that the motion to lift the stay sought "our specific approval for the trial court to incorporate [the parties'] agreement in the *Mena* proceedings." *Post*, at 742. In fact, the parties' motion requested that the stay be lifted to "permit the parties to present to the trial court for its consideration a proposed settlement." Requesting us to allow a settlement proposal to be presented is not the same as asking us to approve its "incorporation" in a case. The effective part of our order granting the motion stated: "The parties in this cause shall be permitted to present to the trial court for its consideration, a proposed settlement of plaintiff's challenge to Senate Bill 31." The dissent contends that this order "told the trial court that he could proceed with the settlement". *Post*, at 745. To the contrary, the order does not address the trial court at all, but merely allows the parties to present a proposed settlement. It does not by any stretch direct the district court to accept the proposed settlement or adjudicate the propriety of the district court's rendition of an agreed judgment. The state defendants' unopposed motion to lift the stay, unaccompanied by any record, raised no issue concerning the validity of the agreed judgment. By granting the motion, we did not, and indeed could not, address such issues. *See Shamrock Fuel & Oil Sales Co. v. Tunks*, 416 S.W.2d 779, 782 (Tex. 1967). We simply allowed the parties to proceed, without ruling on the validity of their actions. Similarly, on October 30 we ordered the stay lifted altogether to allow the case to proceed to trial. This order,

like our October 10 order, allowed further proceedings in the district court. The dissent does not and could not reasonably contend that the effect of the October 30 order was to affirm all subsequent proceedings in the case simply because we allowed them to occur. The October 10 order was no broader.

The district court ordered a reapportionment plan without a determination that Senate Bill 31 was invalid. Although the court granted summary judgment in *Mena* invalidating the statute, the state defendants appealed that ruling. In the settlement agreement the state defendants reserved their contention that the statute is valid, just as plaintiffs reserved their claims. The court expressly based its judgment upon the settlement agreement and not upon any prior evidence or findings. Indeed, to have adjudicated the invalidity of the statute in the agreed judgment would have been contrary to the settlement agreement. Without a determination that Senate Bill 31 is invalid, the district court was prohibited from suspending its effect by article I, section 28 of the Texas Constitution which states: "No power of suspending laws in this State shall be exercised except by the Legislature." We are aware of no instance in any other jurisdiction when a court reapportioned state legislative districts without first deciding that the statutory plan was invalid.

Under these circumstances, the settlement agreement does not provide sufficient basis for the rendition of the judgment dated October 7, 1991, in *Quiroz*, and the judgment dated October 10, 1991, in *Mena*.

### III

■ Having concluded that the judgments of which relators complain were rendered improperly, we must consider whether relators are entitled to relief by mandamus.

To be entitled to mandamus, relators must have a justiciable interest in the underlying controversy. *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex.1984); *Mitchell v. Dixon*, 140 Tex. 520, 168 S.W.2d 654, 656 (1943). Relators as registered voters, like plaintiffs in *Mena* and *Quiroz*, have a justiciable interest in reapportionment. *Baker*, 369 U.S. at 204–208, 82 S.Ct. at 703–705. A person need not be a party to the underlying litigation in order to seek mandamus relief. *Stewart v. McCain*, 575 S.W.2d 509 (Tex.1978); *Hennessy v. Marshall*, 682 S.W.2d 340 (Tex.App.—Dallas 1984, original proceeding).

As a rule, mandamus is not available to compel an action which has not first been demanded and refused. *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 556 (Tex.1990); *Doctors Hosp. Facilities v. Fifth Court of Appeals*, 750 S.W.2d 177, 178 (Tex.1988); *Stoner v. Massey*, 586 S.W.2d 843, 846 (Tex.1979); *Hursey v. Bond*, 172 S.W.2d 305, 306 (Tex.1943). Application of this rule has not been entirely consistent or without exceptions. In *Hursey*, we said: "Mandamus will not lie to compel a court to perform an act ... in the absence of a request for such performance by the party at interest and a refusal to perform on the part of the court." *Id.* In *Stoner*, however, we expressly excused this requirement when the request would have been futile and refusal little more than a formality. There, two parties, Stoner and Hudgins, sought to compel the court of civil appeals to file and rule upon their respective third motions for rehearing. The appeals court had stated in its judgment that it would not entertain further motions for rehearing, and its clerk had refused to file the motion tendered by Stoner. Although Hudgins did not tender her motion to the appeal court clerk, this Court excused the requirement that she do so. "[I]t would have been pointless," we wrote, "to make such an attempt in view of the language of the last judgment of the Court of Civil Appeals. The action of the clerk in refusing to file Stoner's third motion makes that conclusion all the more certain." *Stoner*, 586 S.W.2d at 846. In somewhat similar circumstances in *Doctors Hospital*, we deemed the court of appeals' dismissal of a motion for rehearing as a refusal to deny it, even though the movant did not specifically request that it be denied rather than dismissed. In fact, when directed to

rule on the motion, the appeals court granted it. *Rose v. Fifth Court of Appeals*, 778 S.W.2d 66 (Tex.1989). *See also City of Austin v. Cahill*, 99 Tex. 172, 88 S.W. 542, 545 (1905); *Crouch v. Shields*, 385 S.W.2d 580, 584 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.), *cert. denied*, 382 U.S. 907, 86 S.Ct. 232, 15 L.Ed.2d 159 (1965); *Lake LBJ Mun. Utility Dist. v. Coulson*, 771 S.W.2d 145, 156 (Tex.App.—Austin 1988), *rev'd on other grounds*, 781 S.W.2d 594 (Tex.1989).

Request and refusal have not been required for mandamus relief in every case. In *State Bd. of Ins. v. Betts*, 158 Tex. 612, 315 S.W.2d 279 (1958), the Board of Insurance initiated an original mandamus proceeding in this Court to compel the district court to appoint a statutorily designated liquidator as receiver in a pending proceeding. It does not appear that the Board of Insurance was a party to the receivership proceeding in the district court, or that it requested that court to appoint the receiver mandated by statute. In *State v. Ferguson*, 133 Tex. 60, 125 S.W.2d 272 (1939), the State and other parties moved for mandamus in this Court to compel two district courts in Hidalgo County to vacate their temporary restraining orders prohibiting enforcement of a penal statute. Although it appears that some of the relators were parties in the district court, it does not appear that the State was, or that any of relators requested the district courts to vacate their orders.

Relators had no reasonable opportunity to intervene in *Mena*. They had no reason to want to do so as long as the state defendants were actively defending the validity of Senate Bill 31. To hold that they should have intervened anyway would mean that anyone who might possibly have an interest in a redistricting case must in every situation intervene as soon as he learns of the case or lose the right to do so. Such a requirement would clearly be unreasonable. Not until after September 24, when we stayed all proceedings in *Mena*, did the state defendants abandon their defense of Senate Bill 31 in favor of a settlement with plaintiffs. Of course, relators could not intervene at that time because of our stay.

The dissents assert that relators deliberately chose not to intervene in *Mena* as part of their overall litigation strategy. There is nothing in the record before us to substantiate this assertion, although it was made by counsel opposing relators at oral argument. JUSTICE MAUZY'S dissent even goes so far as to state that "Relators may have been in Judge Ramirez's Edinburg courtroom" the day he rendered final judgment in *Mena*. There is absolutely no suggestion of that before us in any form.

Relators in this proceeding had no opportunity at all to object to the rendition of judgment in *Quiroz*, as JUSTICE MAUZY'S dissent concedes. The dissent states, however: "The lack of opportunities to intervene in *Quiroz*, though, does not excuse the Relators' failure to intervene in *Mena*. Even if the *Quiroz* judgment were set aside, the *Mena* judgment would still remain." *Post*, at 742. In other words, even if relators could have intervened in *Mena* and opposed rendition of judgment in that case, their doing so would not relieve them of the effect of the judgment in *Quiroz*. By their procedural ploys the parties in *Mena* constructed a trap for relators from which the dissent would not let them escape.

Even if relators had attempted to intervene in *Mena* and *Quiroz*, there is no reason to suppose that they would have been more successful than Sims and Lucio. The dissents call this "pure speculation", *post*, at 743, but a review of even the limited record before us demonstrates that the district court determined not to allow intervention in the proceedings once plaintiffs and the state defendants resolved their differences. The district court not only rejected Sims and Lucio's claims, it struck their intervention. In support of its decision, the district court cited *Tarrant County v. Ashmore*, 635 S.W.2d 417 (Tex.1982). *Ashmore* holds that a public official does not have a property interest in his office protected from a taking without just compensation. This holding does not control whether Sims and Lucio, who are State Senators, but who are also citizens and voters of Texas like plaintiffs, have stand-

ing to intervene. Justice Mauzy's dissent states that relators "clearly had the right to intervene". *Post,* at 740. If that is true, surely Sims and Lucio had an equal right to intervene. Inasmuch as the district court struck Sims and Lucio's intervention, despite their "clear right" to do so, it is not unreasonable for relators to conclude that their moving to intervene would be equally futile.

Although relators might have moved to set aside the judgment in *Quiroz* even after it was rendered, we do not view this as a prerequisite to mandamus in this proceeding. It is apparent that any such attempt would have been as futile as attempting to intervene. Sims and Lucio did move to set aside the judgment, and the district court denied their motion. Again, there is no reason to believe that relators would have prevailed where Sims and Lucio failed. As in *Stoner,* the relief relators seek has been requested from the district court by other parties similarly situated and denied. It is very clear that the district court's intention to render the judgment to which plaintiffs and the state defendants agreed was not reasonably subject to being altered by any request of relators.

Justice Hightower's dissent agrees that the district court's judgments were rendered improperly, but argues that if relators are entitled to any relief, it is only that we direct the district court to permit them to intervene. The dissent does not recognize the full ramifications of its argument. If relators must be permitted to intervene at this stage in *Mena* and *Quiroz,* the only relief they could seek from the district court would be to set the judgments in those cases aside. Assuming that they would be required to show that they were not to be faulted for conscious indifference or other inequitable conduct in not intervening sooner, they would meet this requirement as a matter of law in *Quiroz.* In that case, relators indisputably had no opportunity whatever to intervene. Even if the judgment in *Quiroz* were vacated, the judgment pertaining to Senate Bill 31 in *Mena* would remain. According to the dissents, relators could not show lack of conscious indifference as a matter of law in

*Mena.* The net result would be that relators would have accomplished nothing. The coexistence of two judgments in two separate cases concerning the same subject matter makes this an unusual case. Relators did not cause these procedural complexities; they are entirely the doing of plaintiffs and the state defendants to avoid the effect of an order of this Court. To deny any effective relief to relators because of the very actions of which they complain would be unjust indeed.

This case does not, as Justice Hightower's dissent suggests, threaten a deluge of mandamus petitions in this Court. It comes to us in a most unusual posture. In the procedural quagmire that this case presents, we hold that relators satisfy the prerequisites for mandamus relief. They have also demonstrated that they have no adequate legal remedy in this case. They cannot appeal from the judgments rendered in *Mena* and *Quiroz* because they are not parties in those cases. Although it might be possible for them to mount a direct attack upon those judgments in a separate proceeding, it would be virtually impossible for any such litigation to be resolved in time to preserve their claims for relief, given the imminence of elections. The district court's conduct constitutes a clear abuse of discretion, and relators are entitled to mandamus against the district court.

Relators have not demonstrated a right to mandamus against the Attorney General and Secretary of State, however. As we have noted above, the Attorney General acted well within his discretion in attempting to arrange a settlement of the litigation. He has not violated any clear duty in this case. Nor has the Secretary of State done more than submit to the Department of Justice for preclearance the only senatorial districting plan available to him at the time. For these reasons, mandamus will not issue against these officials.

IV

A

■ The district court has previously granted partial summary judgment invali-

dating Senate Bill 31. However, it also set the case for trial on the merits, apparently anticipating the need for additional evidence before the case could finally be adjudicated. The effect of the relief we order today is to return the case to that interlocutory posture. Although we do not address the district court's judgment in *Mena* ordering an alternate representative districting plan in lieu of House Bill 150, we assume the district court will consider whether it suffers the same infirmities as the judgments which are set aside. As we have previously urged, we hope the district court will proceed expeditiously in view of the impending elections.

The court must provide a reasonable opportunity, in these circumstances several days, for interested persons to intervene and be heard. The court should attempt to ascertain whether the Governor, who is a party to the litigation, may be expected to summon the Legislature into special session at once to consider legislative reapportionment. Although article III, section 28 of the Texas Constitution explicitly requires the Legislature to reapportion legislative districts in the first regular session after each United States decennial census is published, neither that section nor any other constitutional provision prohibits the Legislature from acting in later special or regular sessions after the constitutional authority of the Legislative Redistricting Board has expired. Bickerstaff, *Reapportionment by State Legislatures: A guide for the 1980's*, 34 SW.L.J. 607, 661 (1980); *White*, 412 U.S. at 789 n. 7, 93 S.Ct. at 2351 n. 7; *Seamon*, 536 F.Supp. at 938; *Bush*, 224 F.Supp. at 513, 516 (Noel, J., dissenting). *Cf. Mauzy v. Legislative Redistricting Board*, 471 S.W.2d 570, 574 (Tex.1971) (question of whether Legislature could reapportion in special session not decided); *but cf. Terrazas*, 537 F.Supp. at 520, 548. If the Governor elects not to do so, the court should consider whether further deference to allow the Legislature to act is warranted. After hearing any additional evidence and argument on an expedited basis, the court may determine what relief should be ordered. In making this decision, the court should consider the interests of all persons who appear before it, the interests of the State as a whole, and the decisions of the Legislature reflected in Senate Bill 31. *See White*, 412 U.S. 783, 93 S.Ct. 2348. The court must also consider what effect its final judgment may have on the 1992 election schedule.

## B

In sum, we conclude that the district court abused its discretion in rendering the judgment dated October 7, 1991, in *Quiroz*, and the judgment dated October 11, 1991, in *Mena*. Because relators are entitled to mandamus, we direct the district court to vacate those judgments. We are confident that the district court will comply promptly, and our writ will issue only if it does not. Relators' request for relief against the Attorney General and the Secretary of State is denied. Because of the importance of resolving the issues that have been raised as expeditiously as possible to avoid any unnecessary disruption to the 1992 elections, we will refuse to consider any motions for rehearing, and none may be filed.

PHILLIPS, C.J., and COOK, J., join in this opinion.

Concurring opinion by GONZALEZ, J.

Concurring opinion by CORNYN, J.

Dissenting opinion by MAUZY, J., in which DOGGETT, J., joins.

Dissenting opinion by HIGHTOWER, J., in which GAMMAGE, J., joins.

GONZALEZ, Justice, concurring.

I join in Sections I, IIA, III (except the conclusion that the Attorney General acted within his authority in settling the suit) and IV of the plurality opinion. However, I write separately because I disagree that the Attorney General has the power to settle redistricting suits. In my opinion, the purported settlement violates the separation of powers doctrine.[1]

---

1. I disagree with Justice Cornyn that writ should issue against the Attorney General. The settlement agreement entered into by the Attorney General merged into the trial court's judg-

I begin by noting several relevant circumstances that shape this case: 1) the "new" Senate reapportionment plan increases by three the number of predominately Mexican–American senatorial districts; 2) the time period within which the Legislative Redistricting Board (LRB) can redistrict has expired; 3) the filing period for the approaching primary elections opened on December 3 and will close on January 2; 4) the costs of separating the Presidential primary from other primaries (for redistricting purposes) would dramatically increase their cost; 5) special sessions of the legislature are expensive; 6) the Governor declined the Attorney General's first request to call a special session to adopt a revised redistricting plan; and 7) parallel litigation is currently underway in federal court involving the same parties and some of the same issues.[2] In light of these exigent circumstances, it perhaps would be politically expedient and economically advantageous to look the other way and deny the writ of mandamus. However, by denying the writ, we would tacitly approve the unprecedented and flawed process that produced the substitute plan. Because I believe that the process is constitutionally infirm, I concur in the court's judgment.

Our Constitution and statutes confer substantial powers upon the State's Attorney General to settle ordinary civil lawsuits. However, this is not an ordinary civil lawsuit; and the Attorney General's authority does not include the power to bind the state to a settlement that modifies or alters a redistricting plan which only the legislature or the LRB had the power to create. *Compare* TEX. CONST. art. IV, § 22 (Attorney General is state's legal representative) *and* TEX.GOVT.CODE Ch. 402 (delineating Attorney General's duties) *with* State v. Reagan Cty. Purchasing Co., 186 S.W.2d 128, 135 (Tex.Civ.App.—El Paso 1944, writ refused w.o.m.) (Attorney General may not act beyond powers granted by Constitution and statutes). *See also Maud v. Terrell*, 109 Tex. 97, 200 S.W. 375, 376 (1918); *Bullock v. Texas Skating Assoc.*, 583 S.W.2d 888, 894 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.).

The Texas legislature has the primary responsibility to reapportion the state's legislative districts at its first regular session following each decennial census. If the legislature fails to fulfill its duty, then the LRB has authority to act. TEX. CONST. art. III, § 28.[3] Pursuant to its constitutional mandate, the legislature enacted Senate Bill 31, reapportioning the state's voting districts. When the period within which

---

ment. This agreement did not relieve the trial court from making a full adjudication of the facts based on the pleadings.

Because the process by which the substitute reapportionment plan was adopted does not live up to the standard of openness set forth only last year by this court in *Acker v. Texas Water Comm'n*, 790 S.W.2d 299 (Tex.1990), and because the agreement in question did not provide sufficient basis for rendition of the judgment, I agree with the plurality opinion that the trial court abused its discretion and that mandamus should issue against the trial judge.

2. The relators in this mandamus review are plaintiffs in a suit in federal court in the case of *Terrazas, et al. v. Slagle, et al.*, Civ.Action No. A–CA–426, now pending in the United States District Court for the Western District of Texas, Austin Division. A three judge panel hearing is in progress in this suit, which was filed pursuant to 28 U.S.C. § 2284(a). In that case, the plaintiffs seek a declaratory judgment invalidating the Texas Senate's reapportionment plan as embodied in Senate Bill 31. They also have asked for an injunction prohibiting state offi-

cials from conducting elections under the existing and allegedly unconstitutional plan (or any substitute plan). They further want the federal court to supplant S.B. 31 or its substitute with its own interim plan.

3. The Texas Constitution provides that if the legislature does not reapportion the state legislative districts at its first regular session following each decennial census, the LRB, composed of the Lieutenant Governor, the Speaker of the House of Representatives, the Comptroller of Public Accounts, the Attorney General and the Commissioner of the General Land Office shall meet within 90 days after adjournment of the regular session and complete the reapportionment process within 60 days after assembling. TEX. CONST. art. III, § 28.

The legislature reapportioned in a special session in 1911, 1921 and 1971. Bickerstaff, *Reapportionment by State Legislatures: A Guide for the 1980's*, 34 Sw.L.J. 607, 623 n. 129. *See also* Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis*, 159 (1977).

the LRB had authority to act expired, the respondents challenged the constitutionality of Senate Bill 31 in the trial court. The Attorney General initially defended the statute and appealed the trial court's judgment holding the statute unconstitutional. Anticipating that the trial court's judgment holding the statute unconstitutional would be affirmed, the Attorney General requested the Governor to call a special session to remedy the existing redistricting plan; but, as the news media widely reported, the Governor decided against calling a special session.[4] The trial court enjoined enforcement of the legislature's reapportionment plan. Before we could hear an appeal on the merits of this decision, the Attorney General settled with the respondents and other interested parties. While not conceding that S.B. 31 was unconstitutional, the Attorney General agreed that a new suit would be filed, and on the same day a consent judgment would be rendered in that suit, providing for a substitute reapportionment plan.

The Attorney General had no power or authority to enter into this consent judgment. The Texas Constitution explicitly provides for the separation of powers among three branches of government: the legislature, the executive, and the judiciary. TEX. CONST. art II, § 1. And the Constitution prohibits any branch exercising "any power properly attached to either of the others, except in instances expressly permitted." *Id.* Here, the legislature and the LRB have the express power to reapportion the senate voting districts, and the Attorney General has no statutory or constitutional power to alter this process. Thus, he exceeded his authority, and his unauthorized action did not bind the state. *See Reagan,* 186 S.W.2d at 135.[5]

In representing the state in these matters, the Attorney General had no particular justiciable or proprietary interest upon which to settle, because, by virtue of the position he holds, he represents all the people of Texas. When he agreed to change several voting districts' boundaries, he in-

---

4. The Governor doubtlessly was well aware of the protracted, expensive, and confusing litigation that has tarnished Texas' redistricting efforts over the past 30 years. She perhaps thought that it would be a waste of time and resources to call a special session to enact a substitute plan only to have a federal court ultimately disregard the state's remedial action and institute its own plan. In light of this backdrop, one can hardly blame her. *See, e.g., Terrazas v. Clements* 537 F.Supp. 514 (S.D.Tex. 1982); *Graves v. Barnes (Graves II),* 378 F.Supp. 640 (W.D.Tex.1974), *aff'd sub nom., Briscoe v. Escalante,* 435 U.S. 901, 98 S.Ct. 1444, 55 L.Ed.2d 492 (1978); *Graves v. Barnes (Graves I),* 343 F.Supp. 704 (W.D.Tex.1972), *aff'd sub nom., Archer v. Smith,* 409 U.S. 808, 93 S.Ct. 62, 34 L.Ed.2d 68 (1973); *Bush v. Martin (Bush II),* 251 F.Supp. 484 (S.D.Tex.1966); *Kilgarlin v. Martin,* 252 F.Supp. 404 (S.D.Tex.1966), *rev'd sub nom., Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); *Bush v. Martin (Bush I),* 224 F.Supp. 499 (S.D.Tex.1963), *aff'd,* 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964); *Clements v. Valles,* 620 S.W.2d 112 (Tex.1981); *Smith v. Craddick,* 471 S.W.2d 375 (Tex.1971); *Mauzy v. Legislative Redistricting Board,* 471 S.W.2d 570 (Tex.1971); *see generally* S. Bickerstaff, *Reapportionment by State Legislatures: A Guide for the 1980's,* 34 SW. L.J. 607 (1980).

5. Justice Mauzy's dissent draws the inaccurate conclusion that the Texas Constitution's separation of powers doctrine does not constrain the

Attorney General's powers to settle any lawsuit. In fact, Texas' Constitution and statutes do limit the Attorney General's authority. *See Reagan Cty. Purchasing Co.,* 186 S.W.2d at 135. These limits extend to his power to settle lawsuits.

Section 402.004 of the Texas Government Code specifies as follows:
"An admission, agreement, or waiver made by the attorney general in an action or suit to which the state is a party does not prejudice the rights of the state."
The dissent illogically asserts that any limit on the Attorney General's power will completely constrain all of his authority to settle lawsuits. It is patently unreasonable to conclude that a district attorney will be prevented from entering into a plea bargain if we conclude that the Constitution prevents the Attorney General from settling a reapportionment suit by adopting a plan he finds acceptable. This "peculiarly formalistic" result indeed would ignore the purposes of our Constitution's separation of powers doctrine by arbitrarily concentrating the authority to resolve politically sensitive apportionment disputes in a single individual. Under no circumstances can he be a party to rewriting an apportionment statute.

I also note that there is absolutely no support in the trial court's record for the statement in Justice Mauzy's opinion that Relators were "[I]ndividuals who sat in a courtroom in judicial proceedings in Mena, without ever asking the trial judge to do anything ..." Op. at 739. (Mauzy, J. dissenting).

evitably acted adversely to part of his constituency.[6] Those adversely affected had no chance to intervene and voice their objections to the submitted plan.[7] Without question, the substitute plan was not subjected to the kind of intense study and public scrutiny that is essential in these matters.[8]

I can well appreciate why it was done in this manner; but it sets a bad precedent. The drafters of the Constitution did not envision, and we should not countenance, relegating so important a decision to a back room deal. Public lawsuits that seek to remedy wrongs of "wide constitutional dimension" should not be privately settled. *See Sheffield v. Itawamba Cty Bd. of Supervisors*, 439 F.2d 35, 36 (5th Cir.1971). I would hold that the Attorney General exceeded his authority, and that under the circumstances of this case, the district court did not exercise its judicial power in an appropriate or well considered manner.

I am sympathetic to the Respondents' concerns that the current reapportionment plan may be unconstitutional. But I cannot accept their argument that a general policy favoring the settlement of lawsuits empowered the Attorney General to act, and thus trump our Constitution's express mandate that the legislature or the LRB possess the primary constitutional responsibility for reapportionment. I also reject the notion that the Attorney General's broad authority to protect the state's interests supersedes the legislature's specific Constitutional authority to redistrict. In my view, the legislature should be given an opportunity to remedy the reapportionment plan's deficiencies during a special session. Failing that, only then are the courts empowered to fill the gap.[9]

The legislature cannot call itself in session. *See Walker v. Baker*, 145 Tex. 121, 196 S.W.2d 324, 328 (1946). The Attorney General does not have the unilateral power to annul or void a statute because in his opinion it is unconstitutional. *Cf. State ex. rel. York v. Turpen*, 681 P.2d 763, 767 (Okl.1984) (Attorney General declaring statute unconstitutional encroached on legislature's powers and violated separation of powers doctrine). If the Governor elects not to call a special session, of necessity, the void will be filled by the judiciary.

I am acutely aware of the time-sensitive nature of this reapportionment dispute. As I noted in footnote four, *supra*, I can well appreciate the Governor's assumption that either the Attorney General had constitutional authority to settle this case, or that a special session simply would be a waste of taxpayers' money; because it ultimately is the federal courts that historically have redistricted the state after finding enacted reapportionment schemes illegal. However, since we now hold that the trial court abused its discretion in accepting the agreed judgment, the Governor should call

---

6. Whenever the Attorney General settles a civil suit, by the very nature of the thing, he invariably will displease some members of his "constituency." This however does not diminish his authority to settle regular, ordinary lawsuits. *See, e.g., Executive Condominiums, Inc. v. State*, 764 S.W.2d 899 (Tex.App.—Corpus Christi 1989, writ denied); *Bullock v. Texas Skating Assoc.*, 583 S.W.2d 888 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). However, there is a vast difference between settling for less than all the state is arguably entitled, or deciding whether to appeal an adverse judgment, and agreeing to a judgment that rewrites a statute because the Attorney General thinks that the statute is unconstitutional.

7. Senators Eddie Lucio and Bill Sims attempted to intervene but their intervention was denied by the trial court ostensibly because they had no proprietary interest to the office of Senator.

However, officeholders do not lose their citizenship rights, and thus they had every right to intervene as ordinary citizens.

As to Relators, they had every right to believe that the Attorney General was going to adhere to his original position and vigorously defend the constitutionality of S.B. 31.

8. Reapportionment affects the whole state and before it is done, opportunity to be heard should be afforded to all interested parties. *See Legislature of California v. Reinecke*, 9 Cal.3d 166, 107 Cal.Rptr. 18, 507 P.2d 626, 627 (1973).

9. We are all branches (legislative, executive and judicial) of the same constitutional tree. The powers of each branch are generally exclusive if lawfully exercised. If exercised unlawfully or abrogated when the opportunity for lawful exercise is afforded, the void will be filled by one of the other branches subject to review for legality.

a special session.[10] Each passing day aggravates the problem and increases the likelihood that three federal court judges may impose their own redistricting plan, which, in my opinion, would be an unfortunate result for the state.

The United States Supreme Court has recognized that reapportionment is primarily the duty and responsibility of the state legislature or other state authority rather than of the federal courts. *See, e.g., Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2496–97, 57 L.Ed.2d 411 (1978); *Connor v. Finch,* 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977); *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *Reynolds v. Sims,* 377 U.S. 533, 587, 84 S.Ct. 1362, 1394–95, 12 L.Ed.2d 506 (1964). A federal court should defer to a state legislature's remedy for a legally flawed reapportionment plan, even when it is the federal court that declares the existing apportionment scheme unconstitutional. *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497; *Burns v. Richardson,* 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966). In a jurisprudential era characterized by "new federalism" and crowded federal court dockets, I would hope that our federal colleagues will defer the resolution of these thorny issues to the state. The federal courts have characterized these suits as an "unwelcome obligation." *Wise,* 437 U.S. at 550, 98 S.Ct. at 2502; *Connor,* 431 U.S. at 415, 97 S.Ct. at

1834. Permitting Texas institutions to resolve this problem will relieve them of this obligation.

I would give the Governor a reasonable time to reconsider whether to call the legislature into special session so that it can analyze the reapportionment plan's alleged flaws and construct an appropriate remedy. In light of today's opinion, if the Governor elects to adhere to her prior decision on this matter, I would authorize the trial court to fill the legal hiatus by first extending the time-table for filing for office, and then conducting a hearing during which all interested parties would have an opportunity to participate. Only then is the trial judge empowered to adopt an interim plan "fashioned in the light of well-known principles of equity." *Reynolds,* 377 U.S. at 585, 84 S.Ct. at 1394 (Douglas, J., concurring).[11] This process would allow an "open-door" review of the reapportionment plan as opposed to the "closed-door" process that characterized the substitute plan currently on the table. And this process will further this court's clearly articulated policy of ensuring that the reasons underlying state decisions "be discussed openly before the public rather than secretly behind closed doors." *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 300 (Tex.1990). As Justice Doggett, writing for a unanimous court, succinctly stated last year, "[o]ur citizens are entitled to

**10.** In fairness to the Attorney General, he entered into this settlement when it became evident that the Governor would not call a special session.

**11.** Other state courts have imposed reapportionment plans, but only as a matter of last resort after those authorities charged with properly apportioning the state's voting districts have abrogated that authority. *See, e.g., Hellar v. Cenarrusa,* 106 Idaho 586, 682 P.2d 539, 543–44 (1984) (court ordered reapportionment plan after legislature failed to effectively remedy plan that court had struck down in previous opinion); *Legislature of California v. Reinecke,* 9 Cal.3d 166, 107 Cal.Rptr. 18, 507 P.2d 626, 627 (1973) (court ordered plan after the legislature failed to enact constitutional apportionment scheme after court ruled existing plan unconstitutional); *Butcher v. Bloom,* 420 Pa. 305, 216 A.2d 457, 458–59 (1966) (court imposed apportionment scheme after legislature ignored

court's previous opinion ruling prior scheme unconstitutional and urging remedial action); *State v. Zimmerman,* 23 Wis.2d 606, 128 N.W.2d 16, 17 (1964) (court ordered apportionment scheme effective until legislature and governor enacted replacement); *but see Tam v. Colton,* 94 Nev. 453, 581 P.2d 447, 452 (1978) (court refused to order reapportionment because it would deny the legislature the opportunity to fashion a constitutional plan); *Visnich v. Sacramento Cty. Bd. of Educ.,* 37 Cal.App.3d 684, 112 Cal.Rptr. 469, 471 (1974) (court should interpose scheme only if legislature "remains obdurate and does not, given the opportunity to do so, reapportion" in a constitutional way). These cases all point to the fact that state courts should defer as long as possible from ordering a reapportionment plan. Courts should impose their own plan only after the authorities responsible for implementing reapportionment have failed, and no prospect for any alternative remedy, beyond what the court could do, exists.

know more than the result. They are entitled not only to know what government decides but to observe how and why every decision is reached." *Id.* The process by which the substitute plan was adopted simply does not live up to this standard of openness. I hope that if this state determines to conduct an open review of the allegedly flawed reapportionment plan, then the federal courts would defer, in the interests of comity, from imposing a court-devised plan in favor of permitting Texas to solve its own problems.

CORNYN, Justice, concurring.

I concur with the judgment of a majority of the court, but for reasons that differ from those expressed in the plurality opinion. Although I agree with sections I, III (except the conclusion that Relators have not demonstrated a right to the writ of mandamus against the Attorney General), and the first paragraph of section IV.A of the plurality opinion, I would hold that the Attorney General exceeded his authority and I would not reach the issues discussed in sections II and IV.B. For those reasons, I write separately.

This case concerns a fundamental principle of American constitutional jurisprudence, the doctrine of separation of governmental power. The founding fathers of this nation and this state plainly understood that the best way to control governmental power is to divide it. They knew that it was only by balancing the powers of one branch of government against the powers of the other two that any degree of freedom for the people could be preserved. As James Madison, the father of the United States Constitution wrote:

The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.

James Madison, *The Federalist No. 47* (sesquicentennial ed. 1937). This case *is not* just about this particular Attorney General, who ostensibly agreed to a substitute reapportionment of the Texas Senate after a trial court had temporarily enjoined use of the legislature's own reapportionment of the senate. Indeed, the Attorney General, as the state's lawyer, asserts that he was caught in a constitutional conundrum. With the filing period for candidates beginning December 3, 1991 and the trial court having enjoined implementation of Senate Bill 31 (S.B. 31), the potential loomed for a delay in the upcoming elections. General Morales may have in good faith believed that, when confronted with the hard choices before him, the best course was to agree to a substitute reapportionment for S.B. 31 and request that the Governor call a special session to pass another reapportionment plan. *See* TEX. CONST., art. III, §§ 5, 40. Governor Richards, it has been reported, has steadfastly refused to call a special session for this purpose.

Thus we are confronted, not with a lapse in the constitutional power of reapportionment as some members of this court contend, but a declination by the Governor to allow the legislature to act.[1] This presents the issue of the power of the Attorney General, a member of the executive department of Texas government, to agree to a judgment that reapportions the Texas Senate. Based on the following analysis, I can only conclude that he has no such power. By contending that there is no effective limit to the power of the Attorney General to agree to such judgments, the dissent condones the substitution of such agreements for the official acts of the legislature and ignores the evils that limitations on

1. Were we to condone the actions challenged here, the potential for the usurpation of the legislature's constitutional authority by the executive department, of which the Attorney General and the Governor are members, is staggering. Given that under our constitution a special session of the legislature may only convene when called by the Governor, *any* agreed judgment which supplanted an act of the legislature could not be challenged because of a so-called "constitutional lapse" in the legislature's ability to act. As here, such lapse exists only because the Governor has so far declined to call a special session. The legislature, the elected representatives of the people, would be powerless to pass new legislation overruling such actions until the next biennial general session.

governmental power are intended to prevent.[2] History teaches us all too well the abuses of unlimited governmental power.

## I.

I disagree with the plurality's summary dismissal of the dispute over the Attorney General's power to agree to a substitute senate reapportionment. We are told the issue is not whether he had the authority to agree, but the *effect* of his agreement. While satisfactory to vacate the void judgments below, a result with which I agree, this, I submit, is a judicial focus on the symptom rather than the disease. In my opinion, if the Attorney General has the power to substitute his agreement for the legislature's constitutionally granted power of reapportionment, whatever evidentiary gyrations must be undertaken before the court blesses it are only window dressing. Is it any less likely that the trial court that entered these agreed judgments would have entered a different judgment if the parties were required to engage in a perfunctory evidentiary hearing? Clearly not.

All governmental authority in this state emanates from the citizenry. TEX. CONST. art I, § 2. In their written constitution, Texans have delegated to the Legislature, or in limited circumstances to the Legislative Redistricting Board (hereinafter LRB), the authority to draw legislative district lines. Article III, § 28 of the Texas Constitution provides in pertinent part:

The Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts, agreeable to the provisions of Sections 25, 26, and 26–a of this Article. In the event the Legislature shall at any such first regular session following the publication of a United States decennial census, fail to make such reapportionment, same shall be done by the Legislative Redistricting Board of Texas, which is hereby created, and shall be composed of five (5) members as follows: The Lieutenant Governor, the Speaker of the House of Representatives, the Attorney General, the Comptroller of Public Accounts and the Commissioner of the General Land Office, a majority of whom shall constitute a quorum. Said Board shall assemble in the City of Austin within ninety (90) days after the final adjournment of such regular session. The Board shall, within sixty (60) days after assembling, apportion the state into senatorial and representative districts, or into senatorial or representative districts, as the failure of action of such Legislature may make necessary.

Because the constitution expressly grants the redistricting power for senatorial and representative districts to the legislature and the LRB and describes the means for exercising the power, such are the exclusive means by which the power can be exercised. *See Parks v. West*, 102 Tex. 11, 111 S.W. 726, 727 (1908) ("It is a rule for the construction of constitutions, constantly applied, that where a power is expressly given and the means by which, or the manner in which, it is to be exercised is prescribed, such means or manner is exclusive of all others."); *accord Houchins v. Plainos*, 130 Tex. 413, 110 S.W.2d 549, 553 (1937). Accordingly, the executive branch, including the Attorney General, has no reapportionment power.

This conclusion is also compelled by the doctrine of separation of powers, implicit in the federal constitution, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 842–43, 79 L.Ed. 1570 (1935), but explicit in the Texas Constitution. The separation of powers provi-

---

**2.** As Justice Holmes observed, the constraints of law are not primarily designed for persons with good intentions: "[Y]ou must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict." Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 459 (1897). I think it is likely that the framers of the Texas Constitution of 1876 shared Holmes's view of human nature. The framers were disillusioned with the abuses of government power during Reconstruction and "sought all possible means to forestall oppressive, corrupt and expensive government." Bruff, *Separation of Powers Under the Texas Constitution*, 68 TEX.L.REV. 1337, 1339 (1990).

sion, which has been present in every Texas Constitution since 1845, declares:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1. Thus, under our constitution, it is only by *express* constitutional provision that the executive department could legitimately exercise the redistricting power.[3] As has been noted, under article III, § 28, that power is expressly granted to the legislature and the LRB, not to the executive department.

Finally, this holding is compelled by the absence of specific constitutional authorization for the Attorney General's agreement to the substitute senate districts ordered by the trial court's judgment.[4] It is true that the Constitution and laws of this state generally grant the Attorney General broad authority in exercising his role as the state's lawyer. *Maud v. Terrell,* 109 Tex. 97, 200 S.W. 375, 376 (1918) (upholding the exclusive constitutional grant to the Attorney General to represent the Comptroller, as a state official); *Bullock v. Texas Skating Assoc.,* 583 S.W.2d 888, 894 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.) (holding that it is within the authority of the Attorney General to decide whether to appeal an adverse judgment). But, it is fundamental to our jurisprudence that the Attorney General may only act within his constitutional or statutory authority. *Day Land & Cattle Co. v. State,* 68 Tex. 526, 4 S.W. 865, 867 (1887). Any of his actions beyond the scope of his delegated power are not binding on the state.[5] *State v. Reagan County Purchasing Co.,* 186

---

3. There are exceptions to this rigid prohibition under which legislative authority has been delegated under certain circumstances. *See Trimmier v. Carlton,* 116 Tex. 572, 296 S.W. 1070, 1079 (1927); Annotation, *Permissible Limits of Delegation of Legislative Power,* 79 L.Ed. 474, 479–80 (1934). First, it is not an unconstitutional delegation of legislative power for the legislature to grant to a person or governmental entity certain of its powers which the legislature "cannot itself practically and efficiently exercise, such as the making of railroad rates." *Trimmier,* 296 S.W. at 1079. Second, the legislature may also delegate "the power to make rules to carry into effect complete laws." *Id.*

Third, the legislature may constitutionally delegate the power to find facts upon the ascertainment of which a completed law shall be applicable. *Tuttle v. Wood,* 35 S.W.2d 1061, 1065 (Tex. Civ.App.—San Antonio 1930, writ ref'd). Fourth, the legislature "may enact a law to become operative upon a certain contingency or future event." *Trimmier,* 296 S.W. at 1080. Finally, the legislature may delegate legislative authority concerning matters of local concern. *Ex parte Brewer,* 68 Tex.Crim. 387, 152 S.W. 1068, 1069–70 (1913). Clearly, the power to draw district lines does not fall under any of these exceptions and is not a delegable power.

4. JUSTICE MAUZY's dissent criticizes our "wooden" construction of the constitution and formalistic approach. To the contrary, his dissent echoes the words attributed to former Chief Justice Charles Evans Hughes: "The Constitution is what the judges say it is." Address by Charles Evans Hughes at Elmira, New York (May 3, 1907).

5. The Texas Legislature, since 1846, has limited the Attorney General's power to make agreements binding on the state:

> An admission, agreement, or waiver made by the attorney general in an action or suit to which the state is a party does not prejudice the rights of the state.

TEX.GOV'T CODE § 402.004.

Until this court expressly held that the Attorney General, on behalf of the state, was subject to the same rules of civil procedure as any other litigant, *Herring v. Texas Department of Corrections,* 500 S.W.2d 718, 720 (Tex.Civ.App.—Houston [14th Dist.] 1973), *aff'd, Texas Dept. of Corrections v. Herring,* 513 S.W.2d 6, 7–8 (Tex. 1974); *Lowe v. Texas Tech University,* 540 S.W.2d 297, 301 (Tex.1976), the Attorney General successfully asserted that this statute even restricted the admissibility against the state of his evidentiary admissions and limited his power to respond to discovery requests that might be binding on the state. *Harrington v. State,* 385 S.W.2d 411, 417 (Tex.Civ.App.—Austin 1964), *rev'd on other grds,* 407 S.W.2d 467 (Tex. 1966), *cert. denied,* 386 U.S. 944, 87 S.Ct. 977, 17 L.Ed.2d 874 (1966) (interrogatories); *State v. Keeton,* 487 S.W.2d 775, 780 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.), *appeal after remand,* 487 S.W.2d 775 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.) (no admission of party opponent by Attorney General under this statute).

S.W.2d 128, 135 (Tex.Civ.App.—El Paso 1944, writ ref'd w.o.m.). This is because

> "[t]he powers conferred by the Constitution upon the state officials are generally held to be exclusive, and except in the manner authorized by the Constitution, these powers cannot be enlarged or restricted."

*Garcia v. Laughlin,* 155 Tex. 261, 285 S.W.2d 191, 194 (1955).

The general discretionary power of the Attorney General to ˙settle lawsuits on behalf of the state is not the issue here. As a general rule, he has such authority. *Executive Condominiums, Inc. v. State,* 764 S.W.2d 899, 902 (Tex.App.—Corpus Christi 1989, writ denied). *But c.f. Bell v. State,* 727 S.W.2d 806, 809 (Tex.App.—Austin 1987, writ ref'd n.r.e.) (Attorney General cannot settle a case for "less than that to which the State [is] clearly entitled...."). However, the Attorney General as a member of the executive department, simply cannot settle a case in a manner that usurps the express constitutional authority of another department of government.

## II.

The Attorney General also argues that the request of nineteen senators who agreed to the reapportionment plan substituted by the trial court's judgment in this case validates his authority to agree to a substitute reapportionment of the senate. Clearly, that cannot be the case.

First, the Senate has no power to convene itself. *Walker v. Baker,* 145 Tex. 121, 196 S.W.2d 324, 328 (1946). However the nineteen senators convened, it was not an official convocation of the Texas Senate and their acts do not carry the force of law. Any official act attempted by a separate meeting of Senators not convened in a regular or special session is a nullity. *See*

OP.TEX.ATT'Y GEN. NO. O-7061 at 9 (1946).[6]

Furthermore, any argument that nineteen senators could legally have exercised the redistricting power is further eroded by the fact that only members of the Senate were involved. The redistricting power can only be exercised by the entire legislature, consisting of the Senate *and* House of Representatives. *See* TEX. CONST. art 3, § 1. Even the Attorney General does not claim the substitute reapportionment plan to be a legislative product, but argues only that it is "infinitely closer to a legislative product" than the plan advocated by Relators[7] in other legal proceedings. However, since redistricting is a power exercised by *both* houses of the legislature, any purported exercise of that authority by nineteen senators outside of a session of the legislature is void and ineffective to invoke the apportionment power granted under article III, § 28.

## III.

The Attorney General further contends that Relators are not entitled to the writ of mandamus against him because the settlement agreement has been subsumed in the trial court's judgment over which he has no power. Thus, he argues, the question of the Attorney General's exercise of his authority to agree to reapportionment of the Texas Senate has been rendered moot by the trial court's entry of judgment. I disagree. When a question of this nature is capable of repetition and would otherwise evade review, a court is authorized to proceed to address the issue to avoid future repetition. *Dunn v. Blumstein,* 405 U.S. 330, 333 n. 1, 92 S.Ct. 995, 997–98 n. 1, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494–95, 23 L.Ed.2d 1 (1969); *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed.

6. Such an act is "not authorized by Article 4, Section 12; it contravenes Article 3, Section 5; and it is repugnant to Article 3, Sections 17 and 40, and Article 4, Section 8, and there are other propositions supporting such a conclusion." *Id.*

7. In his dissent, Justice Mauzy transparently belittles Relators by emphasizing their political party affiliation. Whether any person before this court is a Republican, Democrat or Independent has no bearing on the issues. Moreover, each justice has taken a solemn oath which obligates each of us to apply the law impartially, regardless of the perceived disability of a party's political affiliation.

310 (1911). In future cases, where suit is filed and an agreed judgment entered on the same day, no one could ever challenge the power of the Attorney General to bind the state to the terms of a substitute redistricting plan. Such a situation is capable of repetition and yet likely to evade judicial review.[8] Thus, this action is not moot and mandamus should conditionally issue to compel the Attorney General to rescind his agreement to the substitute senatorial reapportionment.

## IV.

Additionally, relators seek a writ of mandamus commanding the trial court to vacate the agreed judgments ordering the implementation of the substitute senate reapportionment plan. I agree with a majority of the court that the writ should so issue, but for different reasons than those expressed in the plurality opinion.

The Attorney General contends that mandamus should not lie because Relators had an adequate remedy at law available to them which they declined to exercise. Of course, this court will only issue a writ of mandamus directing a district judge to set aside a judgment when the directed course of action is the only proper course, and the petitioner has no other adequate remedy. *State v. Thurmond*, 516 S.W.2d 119, 121 (Tex.1974). Here, Relators have no other adequate remedy.

Relators are not parties to *Mena* or *Quiroz*. Because they are not parties, Relators have no right to appeal the judgments rendered by the trial court. It is plain that appeal is not an adequate remedy when one has no right to appeal. Further, there is nothing Relators could have done to become parties to the settled suits. Suit was filed, service of citation waived and an agreed judgment signed in *Quiroz*, all on the same day. Relators had no meaningful opportunity to intervene prior to entry of

the agreed judgment. Up until the settlement, the Attorney General was vigorously defending S.B. 31. Because of our stay order, issued in conjunction with the Attorney General's direct appeal to this court after the trial court granted its temporary injunction, no further proceedings in *Mena* were permissible. Furthermore, no one had the right to intervene after the entry of judgment. *First Alief Bank v. White*, 682 S.W.2d 251, 252 (Tex.1984) (no right to intervention after judgment unless court sets judgment aside, even if trial court retains plenary jurisdiction); *Comal County Rural High School District No. 705 v. Nelson*, 158 Tex. 564, 314 S.W.2d 956, 957 (1958). Thus, Relators have no adequate remedy at law.

There is another reason as well why mandamus should conditionally issue against Judge Ramirez. Ordinarily, entry of a consent judgment is a ministerial act by the trial court. *See Pope v. Powers*, 132 Tex. 80, 120 S.W.2d 432 (Tex.Comm'n App. 1938, opinion adopted); *Travelers Ins. Co. v. Williams*, 603 S.W.2d 258, 262 (Tex.Civ. App.—Corpus Christi 1980, no writ). But, for reasons already given, the Attorney General lacked the authority to agree to a plan for reapportionment of senate districts. *See also Department of Public Safety v. Great Southwest Warehouses, Inc.*, 352 S.W.2d 493, 495 (Tex.Civ.App.— Austin 1961, writ ref'd n.r.e.) (Attorney General may not waive sovereign immunity because it would be usurpation of legislative prerogative in violation of the constitutional separation of powers). Furthermore, "[a] judge, even with the Attorney General's consent, is expressly prohibited [by article 1, § 28 of the constitution] from suspending any valid statute." *Houston Chronicle Publishing Co. v. Mattox*, 767 S.W.2d 695, 698 (Tex.1989); *see also, State v. Ferguson*, 133 Tex. 60, 125 S.W.2d 272, 276 (1939); TEX. CONST., art. 1, § 28.[9] Not

---

8. Indeed, it is difficult to see how such actions could *ever* be reviewed based on this argument. *See Public Utility Comm'n v. Cofer*, 754 S.W.2d 121, 126–27 (Tex.1988) (Culver, J., dissenting, joined by Spears, J.).

9. Prohibitions on suspension of the laws partially restate the principle of separation of powers. Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis*, art. I, § 28, author's comment at 85 (1977). Such a prohibition was first declared in the English Bill of Rights of 1689. *Id.* at 83. As is pointed out

even a judgment of a court can serve to enlarge the Attorney General's powers.[10] *State ex rel. Downs v. Harney,* 164 S.W.2d 55, 56 (Tex.Civ.App.—San Antonio 1942, writ ref'd w.o.m.). This court has expressly agreed with the statement of the rule in *Harney* that:

> As the powers and duties of the Attorney General are prescribed by the Constitution and Statutes, those powers must be limited to those so prescribed, and may not be enlarged by the courts.

*Garcia v. Laughlin,* 155 Tex. 261, 285 S.W.2d 191, 194 (1955) (quoting *Harney,* 164 S.W.2d at 56). Since the agreed judgment is based on an unauthorized compromise agreement which has potential impact on a substantial right, the right to equal representation in the electoral process, the agreed judgment is void. *See Johnson v. Rancho Guadalupe, Inc.,* 789 S.W.2d 596, 598 (Tex.App.—Texarkana 1990, writ denied); *see also State v. $50,600.00,* 800 S.W.2d 872, 876 (Tex.App.—San Antonio 1990, writ denied) (where public interest

involved, court can vacate an agreed judgment). Thus, the relator's right to mandamus is not defeated by the fact that the Attorney General's agreed reapportionment plan has been incorporated in the judgments below.

## V.

I also disagree with the court's unwarranted discussion of a Texas trial court's authority to order a remedial reapportionment. Although I do not doubt the power of our courts to invalidate and enjoin a legislative reapportionment in a proper case, the issue of the constitutional power of our courts to reapportion, and the circumstances under which such a remedy could be ordered are not before us. Without citing a *single* opinion of *any* court interpreting the authority of a Texas court under the Texas Constitution to order a reapportionment, the plurality opinion concludes: "Nevertheless, we do not doubt the power of our courts to do so." [11] In my

in the plurality opinion, the agreed judgment in *Quiroz* did not even purport to hold S.B. 31 unconstitutional, but nevertheless enjoined its use.

**10.** Of course, a redistricting plan ordered by a federal court, as contrasted with one ordered by a state court, is binding on the state under the Supremacy Clause. *Upham v. White,* 639 S.W.2d 301 (Tex.1982). "The requirement of the United States Constitution takes precedence and any inconsistency therewith in the Texas Constitution is thereby vitiated." *Smith v. Craddick,* 471 S.W.2d 375, 377 (Tex.1971).

The federal courts did not participate in the reapportionment debate for most of the first 200 years of United States history. Bickerstaff, *Reapportionment by State Legislatures: A Guide for the 1980's,* 34 SW.L.J. 607, 609–10 (1980). In 1962, the United States Supreme Court finally entered the reapportionment fray when it decided *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The *Baker* court, however, did not define a remedy for the federal courts to apply when it ruled that a reapportionment plan was unconstitutional. *Id.* at 198, 82 S.Ct. at 699–700. Justice Douglas, in his concurring opinion, suggested that the district court might direct the state to eliminate the defects in the reapportionment plan or that the district court's mere suggestion that reapportionment is necessary might stimulate legislative action. *Id.* at 250 n. 5, 82 S.Ct. at 727 n. 5 (Douglas, J., concurring). The *Baker* court did not suggest

that the district court actually perform the reapportionment itself.

The Supreme Court first approved a federal district court's remedial apportionment plan in *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964). Since *Reynolds,* the Supreme Court has repeatedly supported federal district courts' exercise of the "unwelcome obligation" to reapportion when the state legislature fails to do so. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977). But the district court's authority to adopt reapportionment plans for state elections rests on the fact that, when the power is exercised, a *federal* court is exercising authority over *state* legislation. *Baker,* 369 U.S. at 210, 82 S.Ct. at 706.

**11.** In arriving at this conclusion, the plurality opinion has imported 35 years of federal court decisions, since the Supreme Court first approved a federal district court's remedial apportionment plan in *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964), and overlaid it on more than 100 years of Texas Constitutional jurisprudence. But the legal history of this state should not be so readily rewritten. As Justice Holmes wrote: "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921) (Holmes, J.). Some of these federal court decisions incorporated today include: *American*

view, any opinion this court might express on this subject in these proceedings would be not only ill-advised, but advisory as well. *See Correa v. First Court of Appeals,* 795 S.W.2d 704, 705 (Tex.1990) (the "judicial power does not embrace the giving of advisory opinions."); *accord Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333–34 (Tex. 1968) ("The courts do not make mere hypothetical adjudications, where there is no presently justiciable controversy before the court, and where the existence of a 'controversy' is dependent on the happening of future events." (cases cited)); *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 646

(Tex.1933) (supreme court has no advisory power). Furthermore, counsel have informed us that a separate settlement and judgment affecting the state house of representatives apportionment has been submitted for preclearance to the Justice Department by the Secretary of State. There are legal challenges to legislative redistricting on going in the federal courts as well. Given the nature and timing of legal challenges to reapportionment on numerous fronts, we can only speculate on the course of future events. Under these circumstances, I am convinced that the under-

Trucking Ass'ns, Inc. v. Smith, 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990); *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981); *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1976); *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Connor v. Williams,* 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972); *Sixty-seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Ely v. Klahr,* 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Parsons v. Buckley,* 379 U.S. 359, 85 S.Ct. 503, 13 L.Ed.2d 352 (1965) (per curiam); *Dickinson v. Indiana State Election Bd.,* 933 F.2d 497 (7th Cir.1991); *Chisom v. Roemer,* 853 F.2d 1186 (5th Cir.1988), *cert. denied,* 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988); *Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176 (9th Cir.1988); *Gjerstein v. Board of Election Comm'rs,* 791 F.2d 472 (7th Cir.1986); *Seastrunk v. Burns,* 772 F.2d 143 (5th Cir.1985); *Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177 (4th Cir.1983); *Ripon Society, Inc. v. National Republican Party,* 525 F.2d 548 (D.C.Cir.1975); *Wallace v. House,* 515 F.2d 619 (5th Cir.1975); *Turner v. McKeithen,* 490 F.2d 191 (5th Cir.1973); *Sheffield v. Itawamba County Bd. of Supervisors,* 439 F.2d 35 (5th Cir.1971); *Daly v. United States,* 483 F.2d 700 (8th Cir.1973); *Taylor v. Monroe County Bd. of Supervisors,* 421 F.2d 1038 (5th Cir.1970); *Montano v. Lee,* 401 F.2d 214 (2nd Cir.1968); *Seamon v. Upham,* 536 F.Supp. 931 (E.D.Tex.1982) *(Seamon I),* vacated sub nom., *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *Seamon v. Upham,* 536 F.Supp. 1030 (E.D.Tex.1982) *(Seamon II);* *Terrazas v. Clements,* 537 F.Supp. 514 (N.D.Tex.1982) *(Terrazas I);* *Terrazas v. Clements,* 581 F.Supp. 1319 (N.D.Tex.1983) *(Terrazas II);* *Kilgarlin v. Martin,* 252 F.Supp. 404 (S.D.Tex.1966), *reversed*

sub nom., *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); *Bush v. Martin,* 224 F.Supp. 499 (S.D.Tex.1963) *(Bush I),* aff'd, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964); *Bush v. Martin,* 251 F.Supp. 484 (S.D.Tex.1966) *(Bush II);* *Graves v. White,* 378 F.Supp. 640 (W.D.Tex.1974) *(Graves II),* vacated sub nom., *White v. Regester,* 417 U.S. 906, 94 S.Ct. 2601, 41 L.Ed.2d 210 (1974); *Graves v. White,* 446 F.Supp. 560 (W.D.Tex.1977) *(Graves IV),* aff'd sub nom., *Briscoe v. Escalante,* 435 U.S. 901, 98 S.Ct. 1444, 55 L.Ed.2d 492 (1978); *Graves v. Barnes,* 343 F.Supp. 704 (W.D.Tex.1972), aff'd, 409 U.S. 808, 93 S.Ct. 62, 34 L.Ed.2d 68 (1972). Of course, substantive decisions by the federal courts are binding on our court under the Supremacy Clause of the United States Constitution. *Upham v. White,* 639 S.W.2d 301 (Tex.1982). But it does not follow that just because the federal judiciary has injected itself into the politically charged atmosphere of reapportioning state legislatures that we ought to blindly follow.

The plurality also relies on the assumption of this power by other state courts to support its conclusion that Texas courts likewise have such authority. *See e.g., Fumarolo v. Chicago Bd. of Education,* 142 Ill.2d 54, 153 Ill.Dec. 177, 566 N.E.2d 1283 (1990); *State v. Gage,* 377 P.2d 299 (Wyo.1963); *Midway Orchards v. County of Butte,* 220 Cal.App.3d 765, 269 Cal.Rptr. 796 (1990); *Resident Electors of the Pennsbury School Bd. v. Pennsbury School Bd.,* 132 Pa. Cmwlth. 362, 572 A.2d 1303 (1990); *Butcher v. Bloom,* 415 Pa. 438, 203 A.2d 556 (1964); *Newbold v. Osser,* 425 Pa. 478, 230 A.2d 54 (1967); *Board of Directors of the Hazleton Area School Dist. v. Valley Education Ass'n,* 107 Pa.Cmwlth. 110, 527 A.2d 1091 (1987); *Board of Directors of the Hazleton Area School Dist. v. Valley Education Ass'n,* 105 Pa.Cmwlth. 565, 524 A.2d 1083 (1987). However, the fact that other state's courts have assumed the authority to order reapportionment can be nothing more than of academic interest when deciding what the *Texas Constitution* and the *Texas* case law have to say about the division of government power in *Texas.*

standable desire to provide guidance would merely confuse, not clarify, further legal proceedings.

Additionally, unnecessarily deciding that a lone Texas trial court of general jurisdiction has the power to reapportion and the circumstances under which that power may be exercised should be of concern for other practical and procedural reasons as well. In fact, the unprecedented power vested today in our state trial courts raises more questions than answers. For example: What preclusive effect would such a trial court judgment have? Would a prior reapportionment challenge bar a subsequent suit by different parties who may have wholly different interests? Would a determination of invalidity on one constitutional ground bar subsequent litigation on separate and distinct grounds? How is notice to all potential intervenors to be accomplished? Who bears the cost of effecting notice? Can the trial court's reapportionment be set aside by an intervenor based on inadequate notice? How are multiple concurrent state court challenges in different trial courts to be consistently resolved in the absence of the power to coordinate or consolidate all such trial court proceedings as the federal courts are empowered to do in multidistrict or multicircuit litigation? These are but a few of the unanswered questions which naturally flow from the wholesale engrafting of federal court reapportionment jurisprudence on our state judicial system, not to mention the implicit overruling of innumerable years of Texas constitutional case law.

Under traditional rules of res judicata and collateral estoppel, the risk of inconsistent and conflicting judgments is minimized. The doctrine of collateral estoppel only bars relitigation of (1) facts in a subsequent action that were fully and fairly litigated in a prior action (2) if those facts were essential to the judgment in the prior action and (3) if the parties in the prior action were cast as adversaries. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex.1984); *accord Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990). The doctrine of res judicata, as a general rule, only bars relitigation of issues that either were, or reasonably should have been, litigated between the same parties in the prior suit. *Griffin v. Holiday Inns of America*, 496 S.W.2d 535, 537 (Tex.1973); *Abbott Laboratories v. Gravis*, 470 S.W.2d 639, 642 (Tex.1971). Under the view of a majority of the court, the risk of inconsistent statewide reapportionments is very real because it is highly unlikely that litigation of a reapportionment claims would often be barred by either collateral estoppel or res judicata. I have no doubt that the rules which the court articulates today will spawn an explosion of state redistricting lawsuits in the future.

## VI.

We have also been informed by counsel, and it is reported in the news media, that the Governor has declined to call a special session of the legislature to address reapportionment. We have no official communication, however, to the effect that the Governor refuses to call a special session under any circumstances, including in the event the judgments below are set aside as we order today. The Governor, as is her prerogative, may change her mind; she may not. She may decide to leave reapportionment of our state legislature to the federal courts. Under our constitution, that is her choice alone.

\* \* \* \* \* \*

In conclusion, under the facts of this case, I would hold that the Texas Constitution vests the sole authority to reapportion in the legislature, except when the jurisdiction of the LRB is invoked; the Attorney General has no authority to agree to a judgment reapportioning the senate; and that the trial court's judgment based on such ostensible agreement is void. For these reasons, I would conditionally grant the writ of mandamus to compel the Attorney General to rescind his agreement upon which the judgment in this case is based. I also agree with a majority of this court that we should conditionally grant the writ to order the trial judge, the Honorable Mario Ramirez, to vacate the agreed judgment

that orders the implementation of new senatorial districts based on the purported agreement of the parties. I agree that there is no particular reason to grant the writ compelling the Secretary of State to withdraw his submission of the substitute redistricting plan for preclearance by the United States Justice Department because the relief we have granted, I believe, accords relators complete relief. Furthermore, because the Justice Department has already cleared the plan, the issue relating to the Secretary of State is moot.

MAUZY, Justice, dissenting.

In this extraordinary proceeding, the Republican Relators object to a redistricting plan designed to increase Mexican–American representation in the Texas Senate. This plan has received pre-clearance approval from the Department of Justice under the administration of President George Bush and has been approved in a timely manner by the trial court so as to avoid disruption of both the filing deadline and the election day for the party primaries. Finding this highly distasteful, and determined to have an appointed federal judiciary guide the process by which Texans elect their legislators, the Relators demand that this court accept their condemnation of Attorney General Dan Morales [1] and declare void the redistricting plan he negotiated.

While careful to pay their personal respects to Mr. Morales as an individual, Justices Gonzalez and Cornyn enthusiastically agree with the Relators. Unwilling to accept this extremist view, which is wholly lacking in constitutional foundation and which would have incredible implications in handicapping the state's handling of future litigation, Justices Hecht, Phillips and Cook specifically deny the very relief sought against the Attorney General. Majority Opinion at 721–722. These three must invent a basis for relief not urged by Relators in their petition, briefs or oral argument but essential to achieving the result which was preordained the day this cause was set for argument.[2]

What Justices Gonzalez, Cornyn, Hecht, Phillips, and Cook have accomplished today is this:

> Individuals who sat in a courtroom in judicial proceedings in *Mena*, without ever asking the trial judge to do anything, are furnished with an order from the Supreme Court that this trial judge abused his discretion by failing to listen to them. Moreover, this incredible order comes not two months after this court told the trial court that he could proceed with the settlement about which complaint is now made.

## I.

The real issue in this proceeding concerns whether this court should adopt a special, unprecedented rule for a group of Republicans who literally sat on their rights on a bench at the Hidalgo County Courthouse quietly watching the trial court.[3] For these particular parties, this

1. "What has happened in the course of proceedings in the Valley is nothing more or less than the Attorney General having ignored and, indeed, trampled on the Texas Constitution. He has ignored his oath of office, he has ignored the separation of powers doctrine, and as importantly, he has ignored the right of the people of the State of Texas to vote.... [He has participated in what] was simply the product of a back-room deal." Oral argument of John McCamish, counsel for Relators, December 10, 1991.

2. Justice Hecht's response to this statement is insightful. Majority Op. at 721 n. 11. He does not deny that the entire plurality opinion is based on grounds never urged in this proceeding. The "substantial body of redistricting litigation throughout the country," from which Justice Hecht derives the "principles" governing this mandamus action is nowhere referenced in Relators' briefs or arguments before the court. Having taken an absolute stand that a settlement agreement could never be approved by the Attorney General or a state district court, Relators never addressed nor attacked the procedural mechanisms for effectuating a settlement. The mandamusable defects in the trial court's actions are the plurality's own invention.

3. "They, it is a fair statement to say, have refused to intervene. They have known, both in regard to the House and the Senate, since, I would say February, when the lawsuit was filed, because our argument has always been it's really a redistricting suit, not just a census suit. But certainly, since June, when the petition was

court, of course, obliges. Republican is the self-description of Relators, whose principal complaint in the federal court proceeding is that the redistricting plan discriminates against their political party. *See Davis v. Bandemer*, 478 U.S. 109, 118–27, 106 S.Ct. 2797, 2802–08, 92 L.Ed.2d 85 (1986); *see also* First Amended Original Complaint in *Terrazas v. Slagle*, No. A–91–CA–426 (W.D.Tex., filed June 7, 1991), at 4. Confidence in our system of justice is dependent upon our judiciary affording equal treatment under the law, regardless of political affiliation. We believe these particular Relators are entitled to equal treatment, but not the special treatment the majority today affords them. Today the majority responds to these Relators in a manner never done in the history of Texas and perhaps in the history of the United States.

## A.

Most parties present their case to a fact-finder, and then seek review if they are dissatisfied with the trial court's decision. The Relators in this case have managed to avoid all that. Instead of participating at trial, the Relators chose to start at the top by initiating their proceeding in this court. This should be a court of last resort, rather than first; thus, I would deny the mandamus.

Ordinarily, a writ of mandamus will issue only to correct a clear abuse of discretion or a violation of a duty imposed by law when there is no other adequate remedy at law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). Mandamus is not available as a substitute for a legal remedy. *Industrial Accident Board v. Glenn*, 144 Tex. 378, 190 S.W.2d

805, 807 (1945). Thus, if there is an adequate remedy by appeal, mandamus should be denied. *Street v. Second Court of Appeals*, 715 S.W.2d 638, 639 (Tex.1986).

As the Relators correctly note, a nonparty has no right to appeal a judgment. How, then, can an individual interested in a lawsuit obtain appellate review of the trial court's adjudication? The answer is both simple and sensible: under the rules promulgated by this court, the individual must intervene in the trial court. *See* Tex. R.Civ.P. 60. Intervention allows individuals to assert their claims, and defend their interests, in an appropriate manner: by filing pleadings in the trial court and presenting evidence to support those pleadings. By encouraging affected parties to participate in a single trial, intervention promotes speedy disposition of suits, and prevents a multiplicity of actions. *See St. Paul Insurance Co. v. Rahn*, 586 S.W.2d 701, 703 (Tex.Civ.App.—Corpus Christi 1979, no writ). Equally important, intervention ensures that affected parties will have prompt appellate review through normal channels. *See, e.g., Coffee v. William Marsh Rice University*, 403 S.W.2d 340, 341 (Tex.1966).[4]

## B.

As Texas citizens, the Relators clearly had the right to intervene in the suits underlying this action. *See Baker v. Carr*, 369 U.S. 186, 204–08, 82 S.Ct. 691, 703–05, 7 L.Ed.2d 663 (1962) (citizens have justiciable interests as voters); *see also Guaranty Federal Savings Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990) (setting out standards for intervention). In

amended in the state court suit to say this is clearly a redistricting suit. Since then, they have been on notice, they have attended the hearings, they have sat in the audience and watched. They have known of the existence of this proceeding and, ... they have refused to participate." Oral argument of Renea Hicks, Counsel for real parties in interest, Dan Morales and John Hannah, Jr., December 10, 1991. Counsel for Relators conceded that his clients were either in attendance or aware of all these proceedings from at least the point at which they filed their federal lawsuit in June. Oral argument of John McCamish.

**4.** *Coffee* was a trustees' suit to construe a charitable trust. The Attorney General of Texas was the named defendant; but two groups of claimed beneficiaries intervened. Though the Attorney General chose not to appeal the trial court's judgment, one group of beneficiaries did appeal. After the court of appeals declined to consider the case, 387 S.W.2d 132, (Tex.Civ.App. 1965) this court reversed, holding that the intervenors had a sufficient interest to prosecute an appeal. 403 S.W.2d at 341.

fact, in oral argument before this court, counsel for the Relators even acknowledged that they had the right to intervene. For the better part of a year, though, they deliberately chose not to do so.[5] *See* Appendix A.

The Relators could have intervened as early as February of this year, when the *Mena* plaintiffs filed suit seeking declaratory and injunctive relief to require the State to develop new reapportionment plans. Conceding that they were fully aware of the proceedings in *Mena*, the Relators admit that they made a conscious decision to wait rather than to intervene.

The Relators were not sitting idle, however. While the *Mena* plaintiffs were making their case in state court, the Relators chose to press their claims in a separate action in federal court. In *Terrazas v. Slagle*, No. A-91-CA-426 (W.D.Tex., filed June 7, 1991), Louis Terrazas, Ernest Angelo, and Tom Craddick, with the same counsel that represents them here, challenged the constitutionality of the very reapportionment plan they now seek to reinstate.

The warning signal the Relators received in February, when *Mena* was filed, became a flashing beacon to intervene on July 29, when the *Mena* proceedings began to spill over into the Relators' federal litigation. On July 29, the State defendants in *Terrazas v. Slagle* filed a "Motion for Stay of State Court Proceedings and Request for Expedited Consideration Due to Imminent Hearing," along with copies of the *Mena* plaintiffs' amended petition. The Relators were thus formally notified that the *Mena* plaintiffs sought injunctive relief ordering the State to develop alternative redistricting plans, and that the State considered developments in *Mena* imminent.

The *Mena* plaintiffs had the good sense to intervene in *Terrazas v. Slagle* to assert their interests and ensure their right to

appellate review of any adverse ruling. The *Terrazas v. Slagle* plaintiffs—Relators here—did not follow suit, in any sense. Instead of intervening in *Mena*, the Relators made a conscious decision to wait.

The Relators could have intervened after August 22, when the *Mena* court declared S.B. 31 unconstitutional. The court's order temporarily enjoined the state from implementing S.B. 31, and directed the State to develop and submit to the trial court new redistricting plans. Again Relators made a conscious decision not to intervene.

The Relators could even have intervened in October, when state officials were publicly urging the Attorney General to agree to a new reapportionment plan. On October 3, the Lieutenant Governor sent a public letter to the Attorney General stating, "You have been requested by a majority of the Texas Senate to pursue a final settlement in the *Mena v. Richards* state district court lawsuit." Additionally, nineteen senators signed a separate letter endorsing a specific reapportionment plan, and urging the Attorney General to "offer it to the district court in *Mena v. Richards* in final settlement of the Senate challenge of the case." Here again, there is no suggestion that the Relators were unaware of the steps leading toward a settlement of *Mena*. Again Relators made a conscious decision not to intervene.

Two of the Relators, apparently realizing that state authorities were on the brink of resolving this matter, did choose to intervene—though not in *Mena*. The federal suit, *Terrazas v. Slagle*, was originally filed by only three of the five Relators here. On October 4—one day after nineteen senators had endorsed the modified plan, and the same day the Lieutenant Governor urged the Attorney General to settle *Mena*—the other two Relators, Robert A. Estrada and Sim D. Stokes, III, intervened in the federal suit. Like their colleagues,

---

5. "[Relators] had every opportunity to fully try and participate in the case in front of Judge Ramirez.... They did not want to submit to the jurisdiction of the court, they did not want to have to sit in Edinburgh, go through the tedious trial, and have to participate in the conclusions that the judge reached because of the

consequences they had to face.... They did not want to be bound by that judgment because they would have collateral estoppel and res judicata problems in their federal suit." Oral argument of James Harrington, counsel for Intervenors, December 10, 1991.

these two made a conscious legal decision to confine their efforts to the federal forum.

The Relators could have attempted to intervene in *Mena* as late as November 27, the day the trial court signed its final judgment and permanent injunction ordering adoption of an interim election plan for the House of Representatives. Not until then did the trial court's "Agreed Partial Final Judgment" of October 11 actually become final. *See City of Arlington v. Texas Electric Service Co.*, 540 S.W.2d 580, 582 (Tex. Civ.App.—Fort Worth 1976, writ ref'd n.r.e.). Thus, Relators had more than six weeks after the October 11 interlocutory partial judgment in which to intervene, but they continued to decline the opportunity to do so.

The Relators' most poignant snub of conventional procedure came on November 25, when the *Mena* case was called for trial on the remaining claims. The Relators may have been in Judge Ramirez's Edinburg courtroom that day; [6] but if so, they did not speak up. Relators may have acted deaf, dumb and blind in the trial court but they experienced no such handicaps in a more friendly forum. They spoke up vigorously here in Austin. While the trial court was considering its final decisions in *Mena*, the Relators filed their motions for relief in this court, seeking to invalidate the trial court's judgment before it even became final.

## C.

We have previously declined to issue mandamus to "those who slumber on their rights." *Callahan v. Giles*, 137 Tex. 571, 155 S.W.2d 793, 795–96 (1941). Here, though, mandamus is even more inappropriate. The Relators were not slumbering; they were wide awake, watching, and waiting to present their claims to what they perceived as a more sympathetic court. By rewarding such tactics, the court today encourages all litigants to start at the top, bypassing the normal appellate process.

Disregarding the months of litigation (and non-litigation) in *Mena*, the plurality keeps its focus fixed on the *Quiroz* judgment, and in doing so loses sight of the real dispute. The proceedings in *Quiroz* amount to no more than a footnote in the history of the *Mena* case: *Quiroz* was filed on October 7 as a procedural device [7] to expedite submission of the modified plan to the Justice Department prior to an October 8 federal deadline.[8] Apart from that one objective, the parties never relied on the *Quiroz* judgment as a final settlement of their dispute over S.B. 31; instead, they filed a motion in this court the same day that judgment was rendered fully informing us of the separate proceeding and seeking our specific approval for the trial court to incorporate their agreement in the *Mena* proceedings. If that were not the case—if the *Quiroz* judgment were standing in isolation, with no relation to the *Mena* proceedings—then this issue would take on a very different complexion. The proceedings in *Quiroz*, though, do not excuse the Relators' failure to intervene in *Mena*. Even if the *Quiroz* judgment were set aside, the *Mena* judgment would still remain.[9]

---

6. *See* note 3, *supra,* concerning admissions of counsel for Relators in oral argument on this point.

7. "*Quiroz* was a procedural device in order to move the Senate plan off to the Justice Department for approval—because we didn't know how long it would take for you all to act and the consensus has always been, no matter how adversarial it's been, that we want to have a new plan if possible for the spring primaries." Oral Argument of James C. Harrington, counsel for Intervenors, December 10, 1991.

8. "We were facing a deadline of October 8th from the Justice Department. And as I said before, no one doubted but that the Justice Department was going to invalidate S.B. 31 at that point. There's nothing written down that says that, but no one doubted it. So there had to be a judgment made." Oral argument of Renea Hicks, counsel for real parties in interest, December 10, 1991.

9. Justice Hecht's suggestion that through *Quiroz*, "the parties in *Mena* constructed a trap for relators from which the dissent would not let them escape," Maj. Op. at 724, ignores the substance of this dissent.

The plurality simply ignores the fact that the Relators indisputably could have intervened in *Mena* anytime during the eight months before *Quiroz*. Moreover, the plurality makes no attempt to explain how the judgment in *Quiroz* would have prevented the Relators from obtaining relief in *Mena*.

The plurality offers two excuses for the Relators' failure to seek relief in the trial court: that the stay granted by this court prevented their intervention and that any attempt to intervene would have been futile because, the plurality prophesies, "the district court's intention to render the judgment to which plaintiffs and the state defendants agreed was not reasonably subject to being altered by any request of relators." Majority Op. at 725.

The stay issued by this court would not have prevented the filing of a motion to intervene by Relators, who were not parties at the time the stay was issued nor covered by its express terms. Moreover, there is no reason they could not, as did the State, petition this court to lift the stay to allow consideration of such a motion.

As authority for its conclusion that intervention would have been futile, the plurality relies on *Stoner v. Massey*, 586 S.W.2d 843, 846 (Tex.1979). In *Stoner*, a court of appeals had issued a judgment which read, in part, "It is hereby ordered that no further motion for rehearing will be entertained in this cause; none may be filed." The effect of such order was to deny a right of appeal to this court. Because the court of appeals' order was clear in its effect and the parties to which it applied, we did not require a further motion to be filed, because "it would have been pointless to make such an attempt." *Stoner* is a unique exception to the traditional rule that mandamus requires "a legal duty to act; a demand for performance and a refusal." 586 S.W.2d at 846. In the absence of a court order expressly noting the existence of a duty and the breach thereof, Texas courts have refused to waive the requirement of an actual demand and refusal:

> The general rule is that the writ will not be granted in anticipation of a supposed omission of duty, however strong the presumption may be that the person sought to be coerced by the writ will refuse performance at the proper time. An important reason for refusing the writ in such cases is, that until the duty is due, no practical question can be presented to the court, but simply a supposed case.

*Love v. Wilcox*, 119 Tex. 256, 28 S.W.2d 515, 526 (1930).

In twisting the *Stoner* exception to encompass the facts before us today, the plurality greatly expands the court's ordinary deference to the trial court to make a ruling before that ruling can be overturned by mandamus. By not asking to intervene, Relators have forfeited their right to appeal. By the plurality's analysis, Relators are excused from this failure to make any request of the trial judge and allowed to bootstrap the right to the extraordinary remedy of mandamus.

The plurality's conclusion that Judge Ramirez would have denied intervention is pure speculation. The fact that the trial court denied intervention by two state senators is not tantamount to denying intervention by all other interested persons, regardless of the grounds they assert as allowing their participation at trial. The plurality's implication is that the trial court gave no real consideration to the attempted interventions by Senators Lucio and Sims, and presumably would give no consideration to claims brought by any others who might intervene.

In reality, the trial court held hearings for two days on the Senators' intervention, and subsequently issued a four-page order discussing the merits of their claims. Moreover, in this mandamus proceeding, the court has not been provided with a full record of the proceedings below, including the motions to intervene in *Quiroz*. The order denying intervention, attached as Exhibit B to Relators' Reply to Responses of Respondents and Intervenors to Petition for Writ of Mandamus, indicates the trial court based its decision on the lack of standing of elected officials to contest whether districts have been properly drawn, citing *Tarrant County v. Ashmore*,

635 S.W.2d 417 (Tex.1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 606 (1982). The limited basis of this order, coupled with a limited record, provides no reason to presume that, presented with a properly drawn motion to intervene, the trial court would not exercise its discretion properly. The plurality's reasoning, contrary to *Wilcox*, anticipates a supposed omission of the trial court to perform its duties. Taking issue with the trial court's denial of intervention of parties not before this court, the plurality apparently suggests that any trial judge who makes a decision the plurality disagrees with must be totally predisposed to reach the wrong result.

The order in *Quiroz* denying the Senators' intervention is not now before this court; and the correctness of the trial court's reasoning is not in issue. The real question is whether a party can totally bypass a trial court on the sole ground that the court made an arguably erroneous ruling concerning claims made by others.

Our judicial system has never allowed parties to circumvent traditional procedures on such flimsy grounds. Even when a trial court dismisses claims for want of jurisdiction, the individual bringing those claims is expected to pursue the normal appellate process, regardless of whether the dismissal was legally sound. *See, e.g., Farah v. Fashing*, 666 S.W.2d 341, 343 (Tex.App.—El Paso 1984, orig. proceeding) (mandamus relief denied because relator had adequate remedy by appeal to challenge the granting of a plea to the jurisdiction). Senators Sims and Lucio sought, within the time the trial court retained plenary power, to have the judgments in *Quiroz* and *Mena* set aside and to intervene. They properly followed the procedural steps dictated by this court in *Times Herald Printing Co. v. Jones*, 730 S.W.2d 648, 649 (Tex.1987) (per curiam). Whether intervention was properly denied may be raised by them on appeal. *Dickerson v. State*, 169 S.W.2d 1005 (Tex.Civ.App.— Austin 1943), *rev'd on other grounds*, 141 Tex. 475, 174 S.W.2d 244 (1943); *see also League of United Latin American Citizens v. Lo–Vaca Gathering Co.*, 527 S.W.2d 507, 508 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.) (order striking intervention may be appealed after rendition of final judgment between the parties).

## II.

Today's decision should dispel any lingering notions that this court's holdings are guided by its own precedent. The plurality today holds that a trial court abused its discretion in doing the very thing this court did, in the very same case, on the very preceding day.

On Monday, October 7, this court was called upon to decide whether the *Mena* court should be allowed to render an agreed judgment as to Senate redistricting based on the *Quiroz* judgment. On that day, the Attorney General filed a motion to modify the stay order that this court had issued in *Mena*. The motion stated that the Attorney General had concluded a settlement agreement resolving the dispute over S.B. 31, that the trial court in *Quiroz v. Richards* had signed an agreed final judgment based on the modified plan, and that the parties wished to present that plan to the trial court in *Mena*. Attached to the motion was a copy of the agreed final judgment in *Quiroz*. Two days later, at the request of this court, the plaintiffs/appellees in *Mena* responded to the motion to modify, stating that they joined the Attorney General in asking that the stay order be modified for purposes of settlement.

Based on the motion and response, it was perfectly clear that the parties intended to settle the Senate portion of *Mena* on the basis of the *Quiroz* judgment. This was no secret agreement or back-room deal; the parties openly sought approval of the Supreme Court of Texas for the trial court to enter judgment adopting their settlement.

If the majority had legitimate concerns about the parties' actions, if its true objective was sound public policy rather than public entrapment, it could easily have said so in this court's prior order. It could have overruled the motion to modify the stay order. It could have issued a modified stay

order directing the trial court to scrutinize the modified plan and to require testimony and statewide public notice before entering judgment. It could even have issued a modified stay order expressly instructing the trial court not to sign a judgment in *Mena* based solely on the judgment in *Quiroz*.

This court did none of those things. Instead, it did exactly what the parties had asked: it modified the stay order to allow the parties to "present to the trial court for its consideration, a proposed settlement of plaintiff's challenge to Senate Bill 31."

As expected, the parties then went to Judge Ramirez with their *Quiroz* judgment, and filed a joint motion for entry of agreed judgment in *Mena*. What was the trial court to do then?

No doubt the trial court looked to this court for guidance, and no doubt the trial court found the guidance it sought. Sometimes our lead may seem difficult to follow—facts differ, times change, and the law evolves—but not this time. Less than twenty-four hours earlier, the Texas Supreme Court had signed off on this very matter. Faced with the same decision, based on the same record, this court had given unqualified approval.

The plurality downplays the October 10 order by likening it to the order of October 30, in which we remanded the remainder of the case for trial. The comparison could hardly be more inapt. The October 10 order was requested and issued so that judgment could be rendered based on the settlement agreement—a procedure for which we now announce new rules—while the October 30 order was requested and issued so that the case could proceed to trial. The comparison would be closer if the October 30 order had sanctioned a particular trial ruling, and this court subsequently held that the trial court abused its discretion in making that ruling. That result, like the present result, would be patently unfair.

Today the plurality provides new instructions to the trial court to govern its handling of the case on remand. We can only wonder what guidelines will prevail the next time this case comes before the court.

III.

Announcing a new approach to agreed judgments, the plurality holds that "[a]n apportionment statute cannot be invalidated and an alternate plan ordered without hearing and careful deliberation," Majority Op. at 720, even in the context of a settlement agreement. The plurality further states that "[t]he hearing should provide sufficient evidence, adduced by testimony, documents, stipulations or some other manner, to permit the district court to make an informed ruling that can be reviewed on appeal." Maj. Op. at 720.

While I wholeheartedly embrace these new requirements, the plurality today demonstrates a markedly different attitude toward openness in government than its members have shown in other recent decisions. *See, e.g., City of San Antonio v. Fourth Court of Appeals*, 820 S.W.2d 762, 778 (1991) (Mauzy, J., dissenting) (noting that the court was thwarting the clear intent of the Open Meetings Act); Supreme Court Order (April 24, 1990) (Gonzalez and Hecht, JJ., dissenting) (opposing procedures to provide greater public access to court records); Supreme Court Order, Misc.Docket No. 92–0008 (Oct. 17, 1991) (Doggett, J., dissenting) (objecting to Supreme Court appointment of major campaign organizer to public office in closed meeting). To whatever extent this change is a lasting one, I welcome it. I have serious concerns, however, about the circumstances giving rise to the plurality's new approach.

As noted above, a writ of mandamus ordinarily issues only to correct a clear abuse of discretion or a violation of a duty imposed by law when there is no other adequate remedy at law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d at 917. It is sometimes said that the respondent must have a clear ministerial duty to perform the act the petitioner seeks to compel. *See, e.g., Jessen Associates, Inc. v. Bullock*, 531 S.W.2d 593, 602 (Tex.1975); *Turner v. Pruitt*, 161 Tex. 532, 342 S.W.2d 422, 423 (1961).

The Relators' repudiation of our traditional procedures makes mandamus relief wholly inappropriate, and this court's prior action in the case makes it doubly so.[10] In this setting, the newfound interest in public participation by Justices Gonzalez, Hecht, Phillips and Cook gives the appearance of a court desperately reaching out to find some plausible basis for the issuance of an extraordinary writ. This professed concern also flies in the face of the facts of this case, which indicate a highly publicized open proceeding, with public hearings in an open courtroom based upon open records, followed by public communications among some of the state's leading public officials and following appropriate public communications with the highest court in Texas.

## IV.

In their opinions,[11] Justices Gonzalez and Cornyn would place severe and totally unjustified limitations upon the Attorney General of Texas in the performance of his constitutional duties. As the state's chief legal officer, the Attorney General has always been understood to possess broad discretionary authority. *See* Tex. Const. art. 4, § 22. We recognized long ago the discretion essential to this authority:

> The office of Attorney General is one of ancient origin, and in all jurisdictions its duties have been multifarious, necessarily involving at all times the exercise of broad judgment and discretion. Even in the matter of bringing suits the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities.

*Charles Scribner's Sons v. Marrs*, 114 Tex. 11, 262 S.W. 722, 727 (1924). *See also Bullock v. Texas Skating Assoc.*, 583 S.W.2d 888, 894 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.).

The opinions by Justices Gonzalez and Cornyn suggest that the Attorney General's authority is sharply limited by the separation of powers provision, Tex. Const. art 2, § 1. Both take a peculiarly formalistic approach to that provision, arguing that it bars the attorney general, as a member of the executive department, from acting in any manner resembling legislative or judicial functions. In adopting that view, Justices Gonzalez and Cornyn fall into the very trap which one respected commentator recently warned against:

> The danger of the formalist approach is that the interpreter may read the constitution woodenly, losing sight of the purposes of separated powers—to prevent arbitrary and inefficient government.

Harold H. Bruff, *Separation of Powers Under the Texas Constitution*, 68 TEX. L.REV. 1337, 1351 (1990). The consequences of accepting this formalist view would be catastrophic:

> To insist that only the legislature make law, only the executive implement statutes, and only the courts adjudicate controversies would destroy modern government. It also would pose insuperable practical and theoretical difficulties.

*Id.* at 1345.

The difficulties posed by the Gonzalez–Cornyn approach are countless. If their view were to prevail, no district attorney could ever negotiate a plea bargain in a criminal matter. The Attorney General could not issue opinions construing state law, and certainly could not construe a state law to be unconstitutional. Nor could the Attorney General settle troublesome cases, or even agree to stipulations to narrow the issues to be litigated. *Cf. United*

---

**10.** If any mandamus relief were appropriate, it certainly would not include directing the trial court to vacate the judgments. Any trial court failure to make a formal finding that S.B. 31 is unconstitutional, which moves the plurality to abandon the judgments completely, could be remedied with an order instructing the court to either amend the judgment or make findings and conclusions in support thereof.

**11.** While entitling his writing a "Concurring Opinion," Justice Cornyn is clearly concurring but also dissenting, insofar as he would grant mandamus relief against the Attorney General. Since the plurality opinion expressly denies that relief sought by Relators, Justice Cornyn's willingness to issue the writ places him firmly in a dissenting position as to that aspect of the judgment.

*States v. State of Texas,* 523 F.Supp. 703, 712 n. 2 (E.D.Tex.1981).[12]

The consequences of the Gonzalez–Cornyn approach would be particularly devastating in the reapportionment context. Under their view, the Attorney General would have to fight every redistricting challenge ceaselessly, at taxpayers' expense, all the way to the United States Supreme Court—even when the Attorney General determines that the proposed plan is unconstitutional, and even if a majority of the state's legislators urge a settlement.

Especially baffling is the logic of Justice Gonzalez's concurring opinion that by agreeing to settle the case, Attorney General Morales "inevitably acted adversely to part of his constituency." Op. at 729. Of course, *any* settlement agreement involving citizens opposing each other may be adverse to part of the Attorney General's constituency, since he represents all Texans. To distinguish between the settlement at issue and any other settlement, Justice Gonzalez simply asserts that "there is a vast difference" between the two, without attempting to explain what that difference is. Opinion at 729 n. 6.

## V.

Since today's writings will affect not only these parties but also the course of future redistricting litigation, I note those important issues on which at least seven justices agree:

1. The attorney general is constitutionally empowered to execute a settlement agreement in litigation challenging a legislative redistricting plan.

2. A trial court is constitutionally empowered to invalidate an unconstitutional legislative redistricting plan.

3. A trial court is constitutionally empowered to adopt a constitutional legislative redistricting plan as a remedy for an unconstitutional legislative redistricting plan.

4. Before rendering judgment to adopt a substitute legislative redistricting plan, a trial court, to the extent possible without disrupting the election process, should show due deference to the legislative and executive branches affording them a reasonable opportunity to remedy constitutional deficiencies.

5. Before rendering judgment to adopt a substitute legislative redistricting plan, recognizing the particular public interest involved in ensuring the integrity of the election process, a trial court should afford a full opportunity for all interested persons to be heard. This should include public notice of its intention to adopt a substitute plan, a reasonable opportunity for interested persons to intervene and be heard concerning same, even if the substitute represents a settlement, and a requirement that evidence be heard to support adoption of the substitute plan.

Our conflict centers on whether the trial court abused its discretion in failing to apply these principles first announced today to these Relators, who never petitioned the trial court for this relief but consciously chose to sit, watch and complain later to this court when dissatisfied with the result he reached.

## VI.

Redistricting cases are particularly time-sensitive; with filing deadlines closing in, and elections looming, the people of Texas have a vital interest in knowing for certain where district lines lie. All three departments of government have an obligation to recognize that interest, impacting as it does the very structure of our electoral system.

Until today, all three departments have been honoring that obligation. The executive branch, through the Attorney General, has worked assiduously to ensure that a viable plan would be timely submitted to the Justice Department. The legislative branch, through the Lieutenant Governor

12. "The state courts have repeatedly confirmed the broad discretion accorded the Attorney General in the exercise of his responsibility to protect the interests of the state through litiga-

tion.... Thus, under state law, the Attorney General necessarily had the power to enter into evidentiary stipulations as a strategic decision at trial."

and nineteen senators, has given to that effort its informal support—the only kind of support it can offer without being called into session. And the judicial branch, through Judge Ramirez, has provided an orderly forum wherein any interested parties could resolve their disagreements in an efficient manner. All of those elements converged in a state courtroom in Edinburg, where Judge Ramirez prudently expedited the proceedings so as to avoid postponing either the filing deadline or the elections.

Today the court thwarts all those concerted efforts.[13] As a result of today's ruling, the only prudent course for Judge Ramirez will be to postpone both the deadline for filing and the elections.[14] Confusion will be widespread, and the costs will be enormous.

The real cost, though, cannot be stated in dollars. The real cost is the blow to our system of justice. Politics, not precedent or the rule of law, has determined the outcome of this action. Every Texan—Republican, Democrat, Independent—suffers when our laws are manipulated as they have been in this proceeding to accord special treatment to a privileged group.

DOGGETT, J., joins in this dissenting opinion.

## APPENDIX A

### 1991 Events Which Relators

### Made a Conscious Legal
### Decision to Ignore

**February 7** Challenge to state redistricting filed in *Mena v. Richards.*

**March 22** State's answer asserts this is redistricting lawsuit.

**June 19** *Mena* plaintiffs amend pleadings to assert redistricting claim. (Even counsel for Relators concedes in oral argument that this became a redistricting lawsuit at this point.)

**July 29** Relators are formally served with copies of the *Mena* plaintiffs' petition, along with a "Motion for Stay of State Court Proceedings and Request for Expedited Consideration Due to Imminent Hearing," in *Terrazas v. Slagle,* Nos. A–91–CA–425, –426, and –428 (W.D.Tex.1991).

**August 5–8** *Mena* plaintiffs present testimony at public court hearing challenging state redistricting.

**August 22** Trial court enjoins state redistricting and orders State to submit new plans by September 30.

**October 3** Lt. Gov. Bullock issues public letter requesting Attorney General Morales to settle Senate portion of lawsuit.

**October 4** 19 state senators issue public letter requesting Attorney General to obtain court approval for their proposed settlement plan.

**October 7** Settlement by *Mena* plaintiffs and defendants based upon proposal of October 4 is incorporated in an Agreed Final Judgment in *Quiroz v. Richards,* No. C–4395–91F. Because of this settlement, Relators determine that the Attorney General is no longer defending S.B. 31.

**October 9** *Mena* plaintiffs join in State's request to Texas Supreme Court that Stay be modified to allow settlement of claims involving S.B. 31.

**October 10** Texas Supreme Court modifies stay order to permit "present[ation] to

---

**13.** The disruptive effect of today's decision on upcoming elections will be all the more severe if, as argued to this court, it extends to the settlement applicable to redistricting of the House of Representatives. Oral argument of John McCamish, counsel for Relators (court's decision "will be [determinative] . . . if you grant the mandamus."), and oral argument of Renea Hicks, counsel for real parties in interest (court's decision will "obviously" have an impact on House redistricting plan), December 10, 1991. If, as suggested by the November 27, 1991 judgment in *Mena,* the House plan was

implemented by a settlement using similar procedural mechanisms found lacking here, it appears that today's action will also disrupt Texans' elections of their state representatives.

**14.** This postponement will be particularly essential if, as a result of the hearing the court mandates today, Judge Ramirez makes even the slightest change in the plans he has already approved, requiring resubmission of those plans to the Department of Justice.

the trial court for its consideration, a proposed settlement of plaintiff's challenge to Senate Bill 31."

October 11 Trial court in *Mena* renders Agreed Partial Final Judgment essentially the same as the judgment of October 7th in *Quiroz.*

October 30 Texas Supreme Court lifts stay of proceedings in *Mena* so that the parties could proceed to trial and the trial court could render a final judgment.

November 25 Hon. Mario E. Ramirez, Jr., Judge of 332nd District Court of Hildago County, calls the *Mena* cause for trial.

Relators choose to ignore the call for trial in the *Mena* case and move for leave to file their petition for writ of mandamus in the Texas Supreme Court.

HIGHTOWER, Justice, dissenting.

I agree that the trial court must find an enacted redistricting plan unconstitutional before imposing an alternative court plan, and must protect the public interest in approving an interim plan pursuant to a settlement. I disagree with the plurality, however, because by deciding this case on the merits as though there had been a proper intervention, the plurality gets the cart before the horse. The first question should be whether relators are procedurally entitled to mandamus relief. I also object to the plurality opinion because it does not set forth exactly what the trial judge must do—what weight he should give to the factors he must consider and the extent of the evidence he must have supporting his findings on those factors.

I

Relators are not entitled to mandamus relief because they consciously chose a litigation strategy to *not* seek their legal remedy of intervention and appeal. The plurality opinion expands the circumstances under which this court may grant mandamus relief by presuming that the trial court would have denied relators' proper request to intervene. That action in itself opens this court to a possible deluge of additional mandamus proceedings which it should not entertain. The plurality opinion goes further to grant relators mandamus relief because they should have been allowed to intervene, without even ruling that by seeking and receiving that relief in this court they have now intervened as a matter of law, and *are henceforth parties* to the trial court proceedings. The plurality's results are logically inconsistent and contrary to our established standards declaring when parties are entitled to mandamus relief. Accordingly, I dissent.

A

The plurality opinion concludes that relators may properly seek mandamus relief here without first seeking to intervene and set aside the judgment in the trial court. The opinion concludes relators have no adequate legal remedy by appeal, and at the same time excuses them from the responsibility of seeking their adequate legal remedy. The opinion allows them mandamus relief of setting aside a judgment, not because it is void, but because the trial court abused its discretion in the manner of approving it; all without requiring the usual appeal to set aside a judgment. The mandamus remedy is not supposed to be a "super appeal" for immediate review "to bypass the ordinary appellate process" of correcting a trial court judgment. *Hooks v. Fourth Court of Appeals*, 808 S.W.2d 56, 60 (Tex.1991). Mandamus should facilitate the ordinary legal remedy of appeal, not substitute for it.

The plurality opinion states that relators are excused from seeking to intervene because the trial court's rulings in *Mena* and *Quiroz* refusing to allow Senators Sims and Lucio to intervene show it would have been a "pointless" request, as in *Stoner v. Massey*, 586 S.W.2d 843, 846 (Tex.1979), or effectively precluded by a prior ruling, as in *Doctors Hospital Facilities v. Fifth Court of Appeals*, 750 S.W.2d 177, 178–79 (Tex.1988).

In *Stoner* and *Doctors Hospital*, the problem was an impasse in our system of

appellate procedure. In *Stoner*, the court of civil appeals had ordered that no further motions for rehearing would be entertained, but a motion for rehearing to the new judgment was a procedural prerequisite to further appeal by application for writ of error to this court. Accordingly, we held that an attempt to file the motion for rehearing was deemed made because attempting it would have been "pointless," and ordered the court of civil appeals to file the motion.

In *Doctors Hospital*, the court of appeals had overruled one party's motion for rehearing while another party's was still pending. The first party sought application for writ of error and this court granted it, all while the other party's motion for rehearing was still pending. Based on the rule that this court's taking jurisdiction by writ of error divested the court of appeals of appellate jurisdiction, the court of appeals had dismissed the other party's motion for rehearing. Again, this action would have precluded the party whose motion was still pending from writ of error relief, because the overruling of its (Doctors Hospital's) motion for rehearing was a procedural jurisdictional prerequisite to this court's taking jurisdiction of its application for writ of error. This court applied a variant of the *Stoner* exception to conclude that it would have been pointless to file a further motion for rehearing, since the court of appeals had concluded it lacked jurisdiction to rule on the motion. In fact, this court had to overrule *Johnson v. Sovereign Camp, W.O.W.*, 125 Tex. 329, 83 S.W.2d 605 (1935), in part, to conclude that the court of appeals had jurisdiction to rule on the pending motion it had a ministerial duty to address under our rules of appellate procedure.

Today the plurality opinion takes the limited exception of *Stoner* and *Doctors Hospital* and extends it (1) to *non-parties*, (2) beyond the *appellate procedure impasse* context, and (3) without requiring as a basis an existing express inconsistent order from the lower court. Both *Stoner* and *Doctors Hospital* involved existing orders making it *impossible* that the lower court could have granted the request, if asked, because to do so would have conflicted with those existing orders. This dangerous and unwarranted extension opens virtually any judgment to attack on the merits by non-party mandamus, based in part on the ground that as non-parties they have no right to appeal.[1] At the same time, the plurality opinion would excuse those attacking the judgment from even having to request intervention to seek the right of appeal on the merits, on pure speculation that the lower court would have denied the request. Thus the plurality would make mandamus the preferred route to question trial court judgments, rather than requiring relators to seek the ordinary legal remedies which would allow them to appeal.

### B

The plurality opinion further defies logic and reason by not declaring that relators in this court have now become intervenors in the trial court proceedings by virtue of the mandamus relief this court grants. The basis for the relief granted is relators' right to intervene in the trial court to assert their rights. By an expansion of *Stoner*, the plurality excuses relators from seeking intervention in the trial court and a legal remedy by appeal. Then, after granting mandamus relief based on that excuse, the plurality opinion declines to declare that by seeking such mandamus relief in this court, and obtaining it, relators become intervenors in the trial court.

The plurality excuses relators from seeking their legal remedy of intervention and appeal. This court by mandamus grants

---

1. The plurality opinion cites *Stewart v. McCain*, 575 S.W.2d 509 (Tex.1978), and *Hennessy v. Marshall*, 682 S.W.2d 340 (Tex.App.—Dallas 1984, writ ref'd n.r.e.), for the proposition that a relator need not be a party to the underlying litigation to seek mandamus relief. That proposition is correct, but it has nothing to do with using mandamus as a *substitute* for appeal. In *Stewart* the non-party relator sought mandamus relief from a discovery order against him, not a judicial declaration that the judgment on the merits be set aside. Likewise, *Hennessy* involved non-party relators who filed a mandamus proceeding in the trial court to quash discovery subpoenas issued against them.

them the same relief of voiding the trial court judgment they could have obtained by their "lost" legal remedy by appeal. But after granting them the rights of intervenors, the plurality does not subject them to the legal consequences of intervention of being bound by the effective "remand" of the judgment this court declares voided. Relators can reverse the trial court judgment for its defects, but the trial court cannot require them to tell it how the judgment is defective. This is "doublethink" at its worst.

Relators did not seek mandamus relief directing that the trial court let them intervene and pursue their legal remedy by appeal. Had that been the relief they sought, then an extension of *Stoner* to presume the trial court would have denied the intervention would be less offensive. It would certainly be more in accord with the rationale for curing the procedural impasses of *Stoner* and *Doctors Hospital.*

Relators today obtain direct mandamus relief to set aside the judgment. That is the same relief they could have obtained by intervention and appeal. This mandamus proceeding has made relators, as a matter of law, intervenors in the trial court's further proceedings and bound by any future judgment it may render. Relators cannot and should not obtain the benefit of setting aside a judgment on its merits without being bound by the new decision to cure their complaints. If the trial court errs again, they can then exercise their ordinary legal remedy by appeal. The plurality and the court should expressly declare that relators are now intervenors bound by any further trial court proceedings.

## II

Because the plurality has granted relators mandamus relief and addressed the merits of their claim, so will I. Again, this is not because I believe relators are entitled to relief after making a tactical decision to not protect their rights by intervention. I am compelled to respond because this is a case of first impression with legal issues of immense importance.

As fully developed in the plurality opinion, Louis Terrazas and others filed this original proceeding seeking a writ of mandamus to compel the Honorable Mario E. Ramirez, judge of the 332nd District Court of Hidalgo County, to vacate judgments in *Quiroz v. Richards* and *Mena v. Richards* which, among other things, challenged Senate Bill 31 (S.B. 31), the most recent reapportionment plan adopted by the legislature for the Texas Senate.[2] Relators assert that Judge Ramirez had no authority to render the judgments in *Quiroz* and *Mena,* and thus these judgments are void. Relators also assert that the power to redistrict is vested exclusively in the State Legislature, the Legislative Redistricting Board (LRB) and the federal courts.[3] I disagree.[4]

## A

Relators argue that article III, section 28 of the Texas Constitution provides the sole

---

2. Although *Quiroz* and *Mena* were both filed in Hildalgo County, none of the relators are citizens of Hildalgo County. Louis Terrazas is a citizen of Bexar County, Ernest Angelo, Jr. is a citizen of Midland County, Tom Craddick is a citizen of Midland County, Bob Estrada is a citizen of Dallas County, and Sim Stokes, III is a citizen of Dallas County. To discourage forum shopping, I urge the legislature to enact legislation providing that exclusive or mandatory venue of an action or proceeding challenging redistricting shall be brought in Travis County. *See generally* Tex.Civ.Prac. & Rem.Code §§ 15.011–15.017; Tex.Ins.Code art. 1.04(f), art. 21.28, §§ 2(i), 4(h), art. 21.49, § 9; Tex.Rev.Civ.Stat. art. 6701h, § 2(b).

3. The federal courts did not participate in reapportionment disputes until 1962. *See Baker v.*

*Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). It defies reality to assume that the framers of our constitution anticipated that the federal courts would inject themselves into the reapportionment process. The current version of Article III, § 28 "was adopted a good many years before the breakthrough in *Baker v. Carr....*" Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis,* Art. III, § 28, comparative analysis at 158 (1977).

4. I find it ironic that the relators, while agreeing that the legislative reapportionment is unconstitutional, would seek the assistance of the federal courts to correct the dilemma while denying the ability of the state courts to protect the interests of the people under the state constitution.

constitutional authority to reapportion under all circumstances.

Article III, § 28 of the Texas Constitution provides in pertinent part:

The Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts, agreeable to the provisions of Sections 25, 26, and 26–a of this Article. In the event the Legislature shall at any such first regular session following the publication of a United States decennial census, fail to make such reapportionment, same shall be done by the Legislative Redistricting Board of Texas, which is hereby created, and shall be composed of five (5) members, as follows: The Lieutenant Governor, the Speaker of the House of Representatives, the Attorney General, the Comptroller of Public Accounts and the Commissioner of the General Land Office, a majority of whom shall constitute a quorum. Said Board shall assemble in the City of Austin within ninety (90) days after the final adjournment of such regular session. The Board shall, within sixty (60) days after assembling, apportion the state into senatorial and representative districts, or into senatorial or representative districts, as the failure of action of such Legislature may make necessary.

If the legislature fails to apportion the state into legislative districts, including a judicial declaration of invalidity, the constitutional duty to do so falls upon the LRB. *Mauzy v. LRB*, 471 S.W.2d 570, 574 (Tex. 1971) ("An apportionment which is invalid, for whatever reason, is no apportionment; and the ... [LRB's] duty to proceed with apportioning the state into representative districts accrued when the regular session adjourned ... without having enacted a valid apportionment statute."). However, since the constitution requires that the LRB assemble within 90 days after adjournment of the regular session of the legislature and complete the reapportionment process within 60 days, the LRB's jurisdiction has expired for the 1990 reapportionment. TEX. CONST. art. III, § 28. Furthermore, the constitution provides no specific alternative when the legislature's apportionment is held to be invalid after the jurisdiction of the LRB has expired. *See* Anderson, *Texas Legislative Redistricting: Proposed Constitutional and Statutory Amendments for an Improved Process*, 43 Sw.L.J. 719, 722 (1989). As a result, under these circumstances, there is a "lapse" in the constitution's express grant of authority to reapportion. However, such "lapse" should not be considered an open invitation to the federal courts to come in and perform what is essentially a state responsibility.

Reapportionment is essentially a legislative function. *See Kilgarlin v. Martin*, 252 F.Supp. 404, 446 (S.D.Tex.1966), *rev'd per curiam*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); *Terrazas v. Clements*, 537 F.Supp. 514, 527 (N.D.Tex.), *stay denied*, 456 U.S. 902, 102 S.Ct. 1745, 72 L.Ed.2d 158 (1982), *further proceedings*, 581 F.Supp. 1319 (N.D.Tex.1983) and 581 F.Supp. 1329 (N.D.Tex.1984). There is no specific constitutional authorization for any department of government to exercise redistricting power under the circumstances in this case. When an existing apportionment plan is declared invalid or unconstitutional, it is appropriate for the legislature to have an adequate opportunity to adopt a substitute plan in a timely fashion. *See Terrazas v. Clements*, 537 F.Supp. at 527. In deference to the legislature and the constitution's initial grant of authority to reapportion to the legislature, a special session of the legislature is the appropriate means to reapportion the senate.[5] *See* TEX. CONST. art. III, §§ 5, 40 (The governor is empowered to call the legislature into one or more special sessions, not to exceed 30 days each session). If for some reason, however, and after an adequate lapse of time in which the governor can make her decision known,

---

**5.** *See* Bickerstaff, *Reapportionment by State Legislatures: A Guide for the 1980's*, 34 Sw.L.J. 607, 661 (1980); Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis*, Art. III, § 28, author's comment at 159 (1977). Reapportionment has been performed in special sessions of the legislature in 1911, 1921 and 1971. Bickerstaff at 623 n. 129, 628.

the governor does not call the legislature into a special session; or if the legislature, when convened, is unable or unwilling to reapportion the legislature;[6] judicial relief such as implementation of a substitute reapportionment plan is both appropriate and necessary.[7]

I agree with the plurality opinion that the Texas courts may order apportionment, and that such power ought to be used only after investigation and careful consideration of the many interests affected, after due deference to the Legislature to rectify its own statutes, and after due regard for the effect of the court's order on the election process.

## B

Relators also argue that the Attorney General did not have authority to agree to a substitute reapportionment plan by settling *Quiroz* and *Mena* and that Judge Ramirez had no authority to render the agreed judgments in *Quiroz* and *Mena.* I disagree.

Article IV, § 22 of the Texas Constitution empowers the Attorney General to "represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party ... and perform such other duties as may be required by law." TEX. CONST. art. IV, § 22. *See also* Tex.Gov't Code, § 402.021. As the state's chief legal officer, the Attorney General is responsible for representing the state in civil litigation and "must exercise judgment and discretion, which will not be controlled by other authorities." *Charles Scribner's Sons v. Marrs,* 114 Tex. 11, 262 S.W. 722, 727 (1924); *Bullock v. Texas Skating Ass'n,* 583 S.W.2d 888, 894 (Tex.Civ.App.— Austin 1979, writ ref'd n.r.e.). The Attorney General, in carrying out his constitutional responsibility to represent the interests of the state, has discretionary power to settle lawsuits on behalf of the state so long as he does not usurp the authority of a co-equal department of government. *See Executive Condominiums, Inc. v. State,* 764 S.W.2d 899, 902 (Tex.App.—Corpus Christi 1989, writ denied). As discussed above, there is no specific constitutional authorization for any department of government to exercise redistricting power under the circumstances present in this cause. Consequently, the Attorney General's agreement to a substitute reapportionment plan by settling *Quiroz* and *Mena* on behalf of the state does not usurp the authority of a co-equal department of government.

## III

Having concluded that neither agreed judgment is void, I agree with the plurality opinion that each judgment is voidable. Since redistricting affects all citizens in their fundamental right to vote and select who will represent them, the trial court has a duty to protect the public interest in approving an agreed judgment adopting an interim reapportionment plan. Those affected by the proposed judgment who are

---

**6.** Among other things, the agreed judgments in *Quiroz* and *Mena* stated that the "state defendants" were permanently enjoined to conduct all primary and general elections for the Texas Senate under the substitute redistricting plan. However, the agreed judgments also stated that the permanent injunction to conduct all primary and general elections for the Texas Senate under the substitute redistricting plan "is dissolved effective immediately upon enactment under Texas law of a districting plan for Texas Senate elections and its preclearance pursuant to the provisions of Section 5 of the Voting Rights Act of 1965...." Obviously the trial court and parties in *Quiroz* and *Mena* appreciated the desirability of a "legislative remedy" in this situation. In addition, the above language in the agreed judgments would be a substantial incentive for the governor to call the legislature into a special session and for the legislature to enact a new redistricting plan for the Texas Senate.

**7.** In addition to granting a declaratory judgment and partial summary judgment declaring the redistricting plans for the Texas Senate (S.B. 31) unconstitutional and issuing a temporary injunction, on August 22, 1991, the trial court directed the "state defendants" to submit "a method to adequately adjust for the 1990 census population undercount, to be used in the apportionment of Texas ... Senate ... districts and election precincts ... on or before September 30, 1991." Subsequently, the Attorney General filed a direct appeal to this court. We granted a requested stay of the proceedings on September 23, 1991, and noted our probable jurisdiction on October 9, 1991.

not parties are entitled to a reasonable opportunity to intervene or appear and be heard. I further agree that deference to the legislature's basic plan and consideration of the proposed interim plan's impact on the electoral process are factors the trial court should consider. Where I part company with the plurality opinion is its failure to distinguish between what must be satisfied to have a valid agreed plan, as opposed to what should or may be considered.

## A

Reasonable opportunity to appear and be heard should be required. So should finding that the proposed plan adequately protects the diverse public interests affected. The record should reflect an evidentiary basis for the trial court's decision. Deference to the legislature's basic plan should not excuse any unconstitutional aspects of the plan. Otherwise, the court's power to declare the legislature's plan unconstitutional is thwarted. It is only the "state policy" reflected in the districts drawn by the legislature that do "not detract from the requirements of the" constitution, to which the courts should show deference. *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973). How to weigh the factors affecting the electoral process are not adequately addressed by the plurality opinion. We should not encourage even temporary use of an unconstitutional plan.

Moreover, by not indicating the extent of trial court discretion in weighing the factors, the plurality opinion leaves the trial court without clear guidance on what it must do to render a judgment not subject to attack. I applaud the plurality's effort in setting forth the factors to be addressed. I am concerned that the trial court, after addressing these factors, may once again be held to have rendered a voidable judgment because it did not weigh the factors correctly. I further believe the court should declare that there are no other factors which must be addressed.

## B

If all the defects making the trial court's approval of the agreed judgment had been urged by a proper party, intervenor or original party, through the ordinary appellate process, I would agree that the court should set aside the judgment. Relators here made no attempt to intervene. Relators purposefully chose to *not* present any complaints to the trial court and *not* afford it the opportunity to correct any error. They made none of the arguments to the trial court found so persuasive by the plurality opinion. In fact, before this court, they argued the judgments were *void,* not that they were voidable. The plurality reaches unreasonably in construing relators' amorphous arguments to support its conclusion that the judgment was voidable. That is not, and has not been, relators' position.

## IV

### Conclusion

The court should have denied mandamus relief because relators purposefully chose to not seek their legal remedy of intervention and appeal. Since mandamus relief does not lie, this court should not have reached the merits of the trial court judgments. On reaching the merits, the court should have concluded the judgments are not void. The trial court, if it conducts further proceedings and approves an agreed interim redistricting plan, should protect the public interest by considering the factors identified in the plurality opinion. If the court fails to do so, its judgment is voidable. The plurality opinion, however, may serve to confuse the trial court because it does not clearly state the weight to be given competing interests. The court errs in issuing the writ of mandamus in this proceeding, and compounds its error through opinions the trial court may well have difficulty following.

GAMMAGE, J., joins in this dissenting opinion.

OPINION ON MOTION FOR LEAVE TO FILE MOTION FOR REHEARING

HECHT, Justice.

█ Despite the statement in our judgment of December 17, 1991, that "[n]o motions for rehearing shall be entertained", some of the real parties in interest in this original proceeding, plaintiffs in the district court, have moved for leave to file a motion for rehearing.[1] Their motion for leave is denied.

Our authority to dispense with motions for rehearing in a particular case is recognized in Rule 190(a), TEX.R.APP.P., which states in part: "In exceptional cases, if the ends of justice require, the court may shorten the time within which [a motion for rehearing] may be filed or even deny the right to file it altogether."[2] We regularly disallow motions for rehearing when time is of the essence, as in cases involving the election process, when an expeditious resolution is critical to preserve the timely progression of the democratic process. *E.g., Sears v. Bayoud,* 786 S.W.2d 248, 254 (Tex. 1990); *Texas Democratic Executive Comm. v. Rains,* 756 S.W.2d 306, 307 (Tex. 1988); *Clements v. Valles,* 620 S.W.2d 112, 115 (Tex.1981); *Garcia v. Carpenter,* 525 S.W.2d 160 (Tex.1975); *Luna v. Blanton,* 478 S.W.2d 76, 79 (Tex.1972); *Mauzy v. Legislative Redistricting Bd.,* 471 S.W.2d 570, 575 (Tex.1971); *Smith v. Craddick,* 471 S.W.2d 375, 379 (Tex.1971); *La Raza Unida Party v. Dean,* 462 S.W.2d 570, 571 (Tex.1970); *Spears v. Davis,* 398 S.W.2d 921, 930 (Tex.1966); *Seay v. Latham,* 143 Tex. 1, 182 S.W.2d 251, 255 (1944); *Iles v. Walker,* 132 Tex. 6, 120 S.W.2d 418, 423 (1938); *Benavides v. Atkins,* 132 Tex. 1, 120 S.W.2d 415, 418 (1938); *Sterling v. Ferguson,* 122 Tex. 122, 53 S.W.2d 753, 763 (1932). In this case, the plurality opinion explained: "Because of the importance of resolving the issues that have been raised as expeditiously as possible to avoid any unnecessary disruption to the 1992 elections, we will refuse to consider any motions for rehearing, and none may be filed." *Ante,* at 726. Our decision to refuse motions for rehearing in this case is thus consistent both with rule and practice.

There is no precedent for us to reconsider this decision. We know of no occasion when this Court has allowed a motion for rehearing after ordering that it would not do so. But this is hardly surprising. If by saying, "[n]o motions for rehearing shall be entertained", we meant only, "we may or may not entertain a motion for rehearing, depending upon who files it and what it says", a party could hardly be expected to take us seriously. Any party who wished to file a motion would be well advised to try. By refusing to adhere to our decision not to allow motions for rehearing in one case, we would cast doubt upon that decision in every case. The result would be to render this tool for avoiding delay and uncertainty in special cases useless.

Movants have demonstrated no compelling reason for us to allow them to file a motion for rehearing in disregard of our own order. They claim that in discovery conducted after we announced our decision in this case, they obtained evidence which provides additional support for their position that relators had ample opportunity to intervene in the *Mena* case in the district court and chose not to do so. Assuming movants have such evidence, their position remain flawed. As we said earlier: "even if relators could have intervened in *Mena* and opposed rendition of judgment in that case, their doing so would not relieve them of the effect of the judgment in *Quiroz.*" *Ante,* at 724. In *Quiroz,* plaintiffs, now movants here, filed suit, defendants answered, and the court rendered an agreed judgment, all in a matter of minutes. Movants do not contend that they have uncovered any information showing how relators could have positioned themselves to intervene in *Quiroz* during the few minutes it was pending. Even if relators could have attempted to intervene in *Quiroz,* although

---

1. Contrary to statements in the dissent, five members of the Court joined in the judgment.

2. This rule was taken verbatim from former Rule 515(a), Tex.R.Civ.P., which was adopted effective September 1, 1941.

it appears to have been practically impossible, we concluded that the record demonstrated that the district court would almost certainly have struck their intervention.

Movants also contend that since we announced our decision relators have demonstrated that they do not wish to intervene in *Mena* or *Quiroz*, preferring instead to pursue their action in the United States District Court. Again assuming movants are correct, relators' reluctance or refusal to intervene in *Mena* or *Quiroz* now, after all that has happened regarding redistricting since the district court rendered its judgments in those cases, has little bearing on whether they could or would have intervened then.

Finally, movants contend that by granting their motion for rehearing and setting aside our prior decision, we would in effect endorse the reapportionment plans previously adopted by the district court and thereby greatly expedite the 1992 elections. Movants have not attempted to explain how our ruling in their favor at this point would influence proceedings involving related issues in the federal courts over which we, of course, have no control. Assuming, however, that granting movants all the relief they seek would bring about all the effects they view as beneficial, we cannot "endorse" reapportionment plans which have never been reviewed on the merits by the district court, for all the reasons given in our previous opinions.

The *legal* issues in this case have been fully addressed. We decline to dignify the dissent by JUSTICE MAUZY and JUSTICE DOGGETT with further response.

PHILLIPS, C.J., and COOK, J., join in this opinion.

Concurring opinion by GONZALEZ, J.

Concurring opinion by CORNYN, J.

Dissenting opinion by MAUZY, J., in which DOGGETT, J., joins.

Dissenting opinion by GAMMAGE, J., in which HIGHTOWER, J., joins.

---

1. Contrary to the dissenters' assertions, I joined in the judgment of the court, including that portion that holds that motions for rehearing

GONZALEZ, Justice, concurring.

I join Justice Hecht's opinion on rehearing but write separately to observe that Justices Mauzy and Doggett mis-characterized the redistricting "mess" as a three-ring circus with federal judges "taming the legislative lion." Dissenting Opinion at 757. With all due respect, the three-judge federal district court, like a 1000–pound gorilla, needed no excuse to do what it has done or what it may do in the future. Our prior opinions in this case did not open the "cage." The cage was opened when Texas joined the Union.

The Supremacy Clause of the United States Constitution provides that the Constitution and laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby...." U.S. CONST. art. VI, cl. 2. Therefore, anything we do or say is irrelevant as to whether the legislative plan or the "federal" plan ultimately will govern the upcoming elections. The outcome now rests with the United States Supreme Court. I hope that the Court, in the interest of comity and deference to the Legislature, will permit the upcoming elections to go forward under the plan adopted by the Texas Legislature in its recent special session.

CORNYN, Justice, concurring.

I agree with a majority of the court that Intervenor's Motion for Leave to File Motion for Rehearing should be denied. Why we should have to reiterate what we said in our judgment of December 17, 1991 is beyond me.[1] Did we mean it then? "Yes." Do we mean it now? The answer is still "Yes." The dissenters were in the minority then; they are in the minority now. Although it is not particularly unusual for any member of the court to be in the minority in any given case, what is unique about this case is the malevolence of Justices Mauzy's and Doggett's dissent. I can only conclude that their zeal has overcome

would not be entertained. I did so because of the need for a semblance of finality to our judgment due to approaching filing deadlines.

their better judgment. I can conceive of no other reason why they would irresponsibly charge members of this court with participating in a conspiracy to pervert justice. Such alleged conspiracy apparently also includes the United States Department of Justice, a federal three-judge panel sitting in Austin, and presumably, the United States Supreme Court before whom related proceedings are pending.

Relators and Respondents, apparently in reliance on the belief that we did mean what we said, have not filed written responses to Intervenors' multiple filings. In the meantime, the dissenters have taken Intervenors' *ex parte*[2] arguments as true. No charitable reason occurs to me why Justices Mauzy and Doggett accept as unimpeachably true the *ex parte* representations of Intervenors and rely on them, as they do, in engaging in a blistering attack on other members of the court.

Furthermore, they would have us revisit, and overrule—apparently without further briefing and arguments—our decision of December 17, 1991 based on alleged factual developments that have occurred *since* our judgment was rendered. Make no mistake, they do not merely argue that we should reverse field and allow Intervenors leave to file a Motion for Rehearing, they've already made up their minds how these alleged subsequent developments should be addressed. They argue that the court should

> reconsider the case, withdraw the prior opinions, commend Judge Ramirez for appropriately handling this matter, and apologize to the people of this state for the millions of dollars of taxpayer monies wasted by the wholly-unwarranted prior decision.

The dissent reminds me of the old saw: "We'll give 'em a fair trial—then we'll hang 'em."

But our prior judgment was rendered following full participation in the proceedings by *all* interested parties and included such procedural and substantive niceties as notice to the parties and an opportunity to be heard. Moreover, our decision was based on the facts as presented at that time, not as they might allegedly subsequently develop. Logically and legally, subsequent developments cannot be considered on the question of the propriety of the court's judgment when it was rendered on December 17, 1991. In their eagerness to condemn all five justices who agreed to the court's judgment, the dissenters somehow overlook the fact that my concurrence is in no way based on Relators' alleged failure to intervene in the *Quiroz* and *Mena* litigation. My concurrence was based solely on my conviction that the Attorney General was constitutionally prohibited from agreeing to a substitute reapportionment for the Texas Senate. Because the Attorney General was without such authority, the trial court's judgment based on such purported agreement was void. None of the Intervenors' *ex parte* arguments are relevant to the concerns expressed in my concurring opinion. Unfortunately, however, the truth is only one of the victims of Justices Mauzy's and Doggett's diatribe.[3]

MAUZY, Justice, dissenting.

A three-ring circus is underway: in the near ring, a majority of this court doing a sidestepping act; in the far ring, President Bush's Department of Justice doing a juggling act; and in the center ring, three appointed federal judges taming the legislative lion. Unfortunately, the people of Texas are being had, not entertained. In this latest development, the majority wants to sweep under the rug new revelations that indicate the injustice it has previously

---

**2.** The dissent quarrels with the use of the term *ex parte* in characterizing Intervenors' original Motion For Leave to File Motion For Rehearing and its four supplements. But that is precisely what Intervenors' one-sided written communications with the court are. *See* BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 231–32 (1987). No other party or interested person has filed a motion for leave to file a

motion for rehearing or an opposition to Intervenors' filings.

**3.** One need only compare the temperate tone of the dissenting opinion of Justices Gammage and Hightower to comprehend the truly venomous nature of the Mauzy/Doggett dissent.

accomplished. Because I believe this injustice should be corrected, not forgotten, I dissent. Rather than summarily rejecting the motion for rehearing the majority should reconsider the case, withdraw the prior opinions, commend Judge Ramirez for appropriately handling this matter, and apologize to the people of this state for the millions of dollars of taxpayer monies wasted by the wholly-unwarranted prior decision.

## I.

In a manner previously unwitnessed in the history of Texas and perhaps in the history of the United States, the majority has twisted and bent our law to afford Republicans more suitable election districts from which to seek legislative office. Politics, not precedent or the rule of law, governed its ill-advised judicial decision.

A well-orchestrated Republican effort to obtain more favorable election districts has occurred contemporaneously in both state and federal forums. Rejecting the reapportionment settlement drawn by the Texas Attorney General on the recommendation of a majority of the Texas Senate, which had been approved by a Texas trial court (acting pursuant to a specific order of the Texas Supreme Court) and then precleared by the Department of Justice, a majority of this court ensured that no valid plan would be in effect at the very time redistricting was being scrutinized by a federal court. By seizing immediately upon the lack of a valid state plan, the federal court justified imposing its own plan based upon Republican recommendations. *Terrazas v. Slagle,* Civil Nos. A–91–CA–425, –426, –428 (W.D.Tex. Dec. 24, 1991). Observing that "there are no legal plans for reapportioning seats for election to the Texas House or Senate that have been precleared by the DOJ," *id.* at 7, the federal court filled the void by crafting its own plans.

If there were any doubts as to the real reasons why the Republican Relators received unprecedented, extraordinary relief, those doubts must surely have vanished on December 24.[1] For the truly unsuspecting, though, Relators have since taken actions that make the situation even clearer. After having been allowed to intervene in *Mena* and *Quiroz,* Relators promptly sought a seven-month continuance of the proceedings in those cases. Then, on January 8, 1992, Relators showed their real interest in *Mena* and *Quiroz* by taking nonsuits in both cases, and refiling their claims in a Midland court. *Craddick v. Richards,* No. B–38,899 (Dist.Ct. of Midland County, 238th Judicial Dist. of Texas, filed Jan. 8, 1992). On the same day, the Relators filed an application in *Terrazas* asking the federal court to stay the state court proceedings indefinitely.

In the face of all this, a majority of this court still stands by its original opinions, decrying the Relators' inability to participate in the state court proceedings. The obvious truth is that the Relators' only interest in those proceedings is in moving them away from Judge Ramirez's Edinburg courtroom—either to the federal courthouse here in Austin, or to Midland County. This court has now done everything to further that aim but put the plaintiffs on a bus headed northward. Justice Hecht's original opinion indicated that the right to intervene justified granting mandamus relief; now he says that the failure of Relators to exercise that right in good faith is of no consequence.

Not everything in the plurality's original opinion is unprecedented. The requirements for redistricting judgments have indeed been developed in numerous cases; and those requirements were unequivocally embraced in the original opinions by at least seven members of the court, including all four dissenters.

The provision of mandamus relief, however, is another matter altogether. The

---

**1.** The plurality takes curious exception to the dissent's use of the term "Republican" to describe these parties. Dissenting Opinion at 746, n. 10. Interestingly, this is the same terminolo-

gy the federal court employed in its writing. *See Terrazas v. Slagle,* slip op. at 3 (designating Relators as "Republican plaintiffs").

plurality's original opinion, while recognizing that "mandamus is not available to compel an action which has not first been demanded and refused," Majority Opinion at 723, nonetheless proceeded to grant relief never demanded and that the trial court had never refused. Under the circumstances of this proceeding, the action approved by five members of this court is not only unprecedented, it is truly incredible.

The Relators were not parties below, and they *never* requested the relief from the Texas trial judge charged with overseeing this litigation, nor was he given an opportunity to refuse to grant the relief granted by the majority. The approach taken by the majority is contrary to what heretofore has been the black-letter law of mandamus, supported by a countless number of decisions from this court and the courts of appeals, including the very recent writing of Justice Gonzalez in *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 556 (Tex.1990, orig. proceeding) ("Without ... a refusal by the trial judge, mandamus ... is improper."). *See also Hursey v. Bond,* 172 S.W.2d 305, 306 (Tex.1943, orig. proceeding) ("Mandamus will not lie to compel a court to perform an act .. in the absence of a request for such performance by the party at interest and a refusal to perform on the part of the court."); *Love v. Wilcox,* 119 Tex. 256, 28 S.W.2d 515, 526 (1930, orig. proceeding); *Cleveland v. County of Jack,* 802 S.W.2d 906, 908 (Tex.App.—Fort Worth 1991, orig. proceeding) (in absence of refusal, mandamus will not lie); *Bantuelle v. Renfroe,* 620 S.W.2d 635, 639 (Tex. App.—Dallas 1981, no writ) (in absence of demand and refusal, mandamus is denied); *Fox v. Lewis,* 344 S.W.2d 731, 734 (Tex.Civ. App.—Austin 1961, writ ref'd n.r.e.) (mandamus relief denied because individuals had watched proceedings without requesting relief). Until the plurality's opinion issued in this cause, the law had always been that you cannot get from this court what you have not first asked the trial court to provide.

## II.

In presenting this case to the court, the Relators painted a picture of insidious, back-room dealings between the Texas Attorney General and the Mexican–American plaintiffs in the underlying redistricting litigation. Counsel for the Relators told the court that the Quiroz/Mena plan "was simply the product of a back-room deal," and that, like Frankenstein's monster, it was brought to life "only in the dead of night." Oral argument of John McCamish, counsel for Relators, Dec. 10, 1991. These shady operations, the argument went, had left the Relators completely in the dark:

> We would have had a right to intervene, but we weren't interested in the census count.... and it didn't turn into a redistricting lawsuit until after we had filed our suit here.
>
> . . . .
>
> Your honor, we were free to intervene early on, but there was no reason to believe that we should have.
>
> . . . .
>
> We were certainly aware of the proceedings again and felt there was no reason for us to intervene in those proceedings. Up until October the 7th, the Attorney General was defending S.B. 31.

*Id.* In other words, since Relators could not foresee any settlement of the case, they had no reason to intervene. The plurality opinion unhesitatingly accepts these claims, almost verbatim:

> Relators had no reasonable opportunity to intervene in *Mena.* They had no reason to want to do so as long as the state defendants were actively defending the validity of Senate Bill 31.

Maj. Op. at 724. The plurality heatedly rejects any suggestion that Relators monitored the proceedings in Judge Ramirez's courtroom:

> The dissents assert that relators deliberately chose not to intervene in *Mena* as part of their overall litigation strategy. There is nothing in the record before us to substantiate this assertion.... Justice Mauzy's dissent even goes so far as to state that "Relators may have been in Judge Ramirez's Edinburg courtroom" the day he rendered final judgment in

*Mena.* There is absolutely no suggestion of that before us in any form.

Opinion at 724. Similar comments appear in Justice Gonzalez's concurring opinion:

I also note that there is absolutely no support in the trial court's record for the statement in Justice Mauzy's opinion that Relators were "[i]ndividuals who sat in a courtroom in judicial proceedings in *Mena,* without ever asking the trial judge to do anything."

Opinion at 728.

The motion for rehearing which Intervenors seek to file places in serious question Relators' account upon which the majority relied.[2] Intervenors now present newly-obtained deposition testimony indicating that Relators were far less than candid to this court regarding their knowledge of the underlying proceedings. On behalf of the Republican Party of Texas, Relators' counsel were formally monitoring the *Mena* proceedings at least as early as July 19, and billed the Republican Party for over 1,400 hours of legal work from July through December. Of those hours, 29.3 are recorded for the period from October 4 through October 7, suggesting that the Quiroz proceedings on October 7 might not have come as a complete surprise.[3] One of Relators' counsel, John Shields, has testified that his work included personally observing the *Mena* proceedings on numerous occasions—including the week of November 25,[4] the very time during which the

plurality insists there is "absolutely no suggestion" of Relators' presence "in any form." Maj. Op. at 724.

Further sworn testimony offered by Intervenors confirms that Relators were fully aware of the parties' intention to settle upon an agreed plan. George Korbel, an attorney who was involved in the *Mena* proceedings, has testified that the Republican Party was constantly informed as to those proceedings, and knew of the ongoing negotiations leading toward the *Quiroz/Mena* settlement.[5] Korbel further testified that he advised the Republicans that "they ought to be sure that their lawyers were involved in that." Korbel deposition at 15. Nonetheless, though counsel for Relators performed over 1,400 hours of work on redistricting for the Republican Party from July to December, the Republicans did not find time to intervene in *Mena.*

In light of this information, the court's decision to afford mandamus relief seems all the more incredible. The court can no longer maintain any plausible pretense that the Relators were unaware of the steps leading toward the *Quiroz/Mena* settlement. By ignoring the Relators' failure to intervene in those proceedings, the court rewards a litigation strategy that is fundamentally at odds with the structure of our judicial system. In essence, the majority has created a new exception to our legal standard for granting mandamus relief, the

---

**2.** Intervenors are the Mexican–American plaintiffs in *Mena,* who are participating in this proceeding as Real Parties in Interest.

**3.** Some unspecified part of the 12.5 hours billed on October 7 was devoted to "attention to Quiroz suit and agreement." Additionally, at least seven billing entries from the preceding three days have been redacted, making it impossible to determine how much time was spent attending to the settlement negotiations.

**4.** Q. What other times were you there in Edinburg for trial?
A. The week before Thanksgiving. I think it was Monday, Tuesday, and Wednesday.
Q. And you were there for all of that?
A. Yes.
Oral deposition of John Shields, Dec. 26, 1991, p. 46. Thanksgiving 1991 fell on Thursday, November 28.

**5.** Q: Did you ever have any other discussions about the *Mena vs. Richards* case in the Edinburg case?
A: We discussed it frequently. [Republican party official Jim Duncan] would call me while the negotiations were going on for the Senate, wanting to know whether or not—what the process was on the negotiations and what we were doing, and he and I had a good personal relationship. I talked to him about those things.
A: Now, when you say the settlement with respect to the Senate, is this a Senate settlement that was eventually effectuated in *Quiroz* and *Mena?*
A: That's correct.
Oral deposition of George Korbel, Dec. 26, 1991, p. 16. Korbel also states that he furnished the Republican Party with over 2,000 pages of documents relating to the redistricting negotiations. *Id.* at 23.

"Triple R" exception: Republican Relators in Redistricting.

## III.

There should be no misunderstanding about the degree of intransigence the court demonstrates today. The court does not deny the Intervenors' motion for rehearing. Rather, the court denies the Intervenors' motion for *leave to file* the motion for rehearing, and sends the motion for rehearing back to the Intervenors without ruling on it. In other words, the court does not even deign to consider any suggestion that the Republican Relators misrepresented salient facts to this court. Given the additional evidence adduced, it is understandable why five members of this court are so eager to seal the lips and tie the hands of the Intervenors.

Contrary to the plurality's protestations, it is indeed rare for this court to refuse to allow any motions for rehearing. Of the thousands of cases decided by this court since the state's birth, the plurality could find only thirteen in which we disallowed motions for rehearing. Significantly, none of those thirteen were decided on grounds that had not been urged by any party, as was this case. Now, as never before, the losing party has been denied any opportunity to argue the grounds upon which the court has decided the case. If the plurality had been interested in fairness as well as promptness, it could easily have shortened the time for filing a motion for rehearing, rather than denying that right altogether. Tex.R.App.P. 190(a).

Moreover, in the past, the court's refusal to allow motions for rehearing always required at least five votes. Today, those votes are simply not there. Only the plurality opinion states that no motions for rehearing may be filed. That portion of the plurality opinion has the approval of only four judges: Justice Gonzalez and the three members of the plurality. Thus, a majority of this court actually disavows the decree that no motions for rehearing may be filed.

Justice Cornyn's original opinion stated that he concurred with "the judgment of a majority of the court," Op. at 731, and the court's official judgment dues state that "[n]o motions for rehearing shall be entertained." That judgment, however, is based solely on the plurality opinion; and Justice Cornyn's language in no way signifies agreement with the plurality's refusal to entertain motions for rehearing. Since Justice Cornyn expressly disavows that portion of the opinion stating that no motions for rehearing will be entertained, there is no "judgment of a majority of the court" on the matter of motions for rehearing. Moreover, Justice Cornyn clearly does not intend to concur in all parts of the judgment, since he disagrees with a significant aspect of it. While the judgment denies relief against the Attorney General, Justice Cornyn's opinion expressly states that he would grant that relief. Op. at 738. We can reasonably conclude, therefore, that Justice Cornyn intended to concur only in the main part of the judgment—that is, only in the granting of mandamus relief against Judge Ramirez.

Justice Cornyn has now decided that he really meant to join in "the judgment of the court." Op. at 756. Notably, though, he does not dispute the observation that he did not join in the *entire* judgment of the court. Try as he might, Justice Cornyn cannot have it both ways: either he joined in only part of the court's judgment, as he previously indicated, in which case the court must allow the motion for rehearing; or, alternatively, he joined in the court's entire judgment, in which case his previous statement that he would issue mandamus against the Attorney General is plainly false.

Having no solid basis on which to deny the motion for leave to file, Justice Cornyn's new writing attacks this dissent in every way except on the merits. Justice Cornyn first questions the very idea of writing on rehearing, since "the dissenters were in the minority then; they are in the minority now." Op. at 756. In case anyone is unaware of this court's practices, it is hardly novel for a dissenting judge to write further on motion for rehearing, even when the judge remains "in the minority."

*See, e.g., Lee v. City of Houston,* 807 S.W.2d 290, 302 (Tex.1991) (Gonzalez, J., dissenting on motion for rehearing). Justice Cornyn then assails this dissent simply for urging a reversal of the court's position, suggesting that there is some "malevolence" in the way this court corrects its errors. Op. at 756. As Justice Cornyn certainly knows, this court typically corrects its errors on rehearing by withdrawing its original opinion and substituting a new one, without additional oral argument.[6] This process hardly avoids "procedural and substantive niceties," as Justice Cornyn strangely suggests; all proceedings on rehearing, like all other proceedings before the court, are supposed to be governed by standard rules.[7]

The implication that the Relators have been denied "an opportunity to be heard," Maj. Op. at 754, is patently false: the Intervenors' original motion has been languishing in this court since January 2, 1992; the Intervenors have since filed four additional motions, repeatedly urging oral argument and action by this court. Relators have had every opportunity to respond to these filings, but have declined to do so. Frankly, I would be eager to have their response, and have no objection to giving them a further opportunity to explain to the court the inconsistencies between their attorney's argument to this court and the sworn evidence presented. Justice Cornyn goes so far as to liken this dissent to a Dodge City judge who says, "We'll give 'em a fair trial—then we'll hang 'em." Op. at 757. What he ignores is that under the circumstances of this case, the Intervenors have already been hung out to dry, and now the majority will not even give them a decent burial.

Equally peculiar is Justice Gonzalez's new opinion, in which he joins fully in "Justice Hecht's opinion," Op. at 756, to deny the Intervenors an opportunity to be heard on their motion and to reaffirm the grave injustice that has been accomplished here. The belated comments in this new opinion serve no legal purpose; they do not address the Intervenors' arguments, and they certainly do not undo the damage done by the court's judgment. Justice Gonzalez fails to note that it was his vote that unleashed what he now characterizes as a "1000–pound gorilla," Op. at 756, by providing the federal court with the rationale for intervening. *See Terrazas v. Slagle,* slip op. at 6.

This court has a solemn obligation to preserve the integrity of its proceedings. By refusing to even consider claims of misrepresentations by the Relators, the court sacrifices that obligation on the altar of partisan politics. Its unwillingness to consider this motion for rehearing contrasts sharply with the "conscious manipulation" by a majority of this court—specifically, Chief Justice Phillips and Justices Cook, Hightower, Hecht, and Cornyn—criticized in *Edgewood Independent School District v. Kirby,* 804 S.W.2d 491, 506 (Tex.1991) (Doggett, J., concurring), where the entire purpose of writing on rehearing was to address matters that had not even been raised in any motion for rehearing.

### IV.

Four Republican members of this court, aided in the final stage of deliberations of this cause by Justice Gonzalez, have subverted the law in a manner never before seen in this state. Their collective action provided the linchpin for federal action that

---

6. *See, e.g., Southwestern Bell Telephone Co. v. FDP Corp.,* 811 S.W.2d 572 (Tex.1991); *Bowman v. Lumberton,* 801 S.W.2d 883 (Tex.1990); *Mitchell v. Missouri–Kansas–Texas R.R. Co.,* 786 S.W.2d 659 (Tex.1990); *Phillip Bros., Inc. v. Oil Country Specialists, Ltd.,* 787 S.W.2d 38 (Tex. 1990).

7. To make the Intervenors' motion seem more sinister than it is, Justice Cornyn repeatedly employs the term "ex parte" to describe the Intervenors' arguments, knowing that the term has highly negative connotations. The only arguments upon which this dissent is based are drawn solely from the record in this cause. In a mandamus proceeding, the parties are permitted to prepare their own record, provided that the materials filed are either certified or sworn. Tex.R.App.P. 121. Materials filed on rehearing have no less stature under this court's rules than those to which other members of this court have referred throughout their respective opinions. All materials in the record have, of course, been served on all parties.

caused "harm to minority voting rights and chaos in the Texas electoral system." [8] Without the ruling by these five, there would have been no basis for federal intrusion. With the ruling, the elected officials of this state's executive and legislative branches have been shut out of the redistricting process. In a circus of legal maneuvering, Relators and their counsel have stood federalism on its head, ensuring that Texas House and Senate districts would be drawn by the federal judiciary. This court's participation in that circus, including its absolute refusal to consider the motion for rehearing, makes the spectacle all the more appalling.

What has occurred here is not justice, but a perversion of justice. And when justice is perverted every citizen of Texas is hurt, people of every party affiliation and of none. The five members of this court who have approved this extraordinary action can object to the characterization of their misconduct in whatever terms they choose, they can attempt to distort the public perception of their misconduct, but they cannot escape the truth. An announcement of this truth, well-known to all nine members of this court, is my responsibility as a judge.

DOGGETT, J., joins in this dissenting opinion.

GAMMAGE, Justice, dissenting.

For the reasons stated in Justice Hightower's original dissent in this cause, I dissent to the failure to permit intervenors a motion for rehearing. Op. 749. Mandamus relief was not proper in this cause because relators consciously failed to exercise their legal remedy of intervention and appeal. The newly produced information that relators had attorneys in and out of the courtroom monitoring the case merely confirms what has already been observed—relators had ample opportunity to avail themselves of their legal remedy of intervention and appeal but, instead, sat on

their rights and consciously chose to avoid intervening.

HIGHTOWER, J., joins in this dissent.

---

8. Second Supplement to Intervenor's Motion for Leave to file Motion for Rehearing, p. 3.